ELMER KRAEGEL *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF WOOD DALE, Defendant-Appellant.

(No. 71-314;

Second District—March 15, 1973.

Samuel A. LaSusa and Dom J. Rizzi, both of Chicago, for appellant.
Edward Van de Houten, Jr., of Glen Ellyn, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Defendant, Village of Wood Dale, appeals from a declaratory judgment granting plaintiffs' proposed use of a 200-unit apartment complex and declaring the village zoning ordinance invalid as applied to plaintiffs' property. At issue are the number of units plaintiffs may place on their property.

Plaintiffs are owners of vacant property located near the center of the Village of Wood Dale. The property is presently zoned M-1 (light manufacturing). It is in the shape of a trapezoid bordered diagonally on the north by the Chicago, Milwaukee and St. Paul Railroad. North of the railroad tracks is the heavily traveled Irving Park Boulevard along which the land is commercially zoned and used. Along the small side of the trapezoid to the east and the southeast is vacant property zoned R-1 (single family residences). Near the center of the southern border of the subject property are single family residences, and to the southwest townhouse zoning. The only access to the property is from the west by Division Street. To the south of Division Street on the western border, the property is zoned R-3 (multiple family residences); and to the north of Division Street on the western border a small vacant parcel is zoned R-1, above which is a commercially zoned and used parcel.

Plaintiffs' proposed construction consists of five uniform four story buildings with a car-and-a-half parking per unit. The buildings would surround a cul-de-sac along with a recreational building, a pool and deck, with substantial amounts of landscaped green area surrounding the buildings. There would be 200 single and two bedroom apartments, two-thirds of which would be two bedroom.

The zoning ordinance of the Village of Wood Dale proides for R-3 multiple family residence districts with certain area-per-dwelling unit limitations. Under R-3 zoning of the subject property, plaintiffs would be entitled to construct approximately 177 units.

The village zoning ordinance also contains a special use provision under which is the subcategory of "Planned Unit Developments". Special uses are designated such in the ordinance because their unique character "cannot be properly classified in any particular district or districts without consideration in each case of the impact of those uses upon neighboring lands and upon the public need for the particular use of the particular location." No special use may be granted by the village unless the proposed use:

"a. is deemed necessary for the public convenience at the location;

b. is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

c. will not cause substantial injury to the value of other property in the neighborhood in which it is located;"

\* \* \*

Allowable special uses include, for example, hospitals and clinics, sanitariums, and libraries.

As part of the Village of Wood Dale's zoning scheme, planned developments may be characterized as a special type of special use. According to the village ordinance they are "of such substantially different character from other special uses that specific and additional standards" are set out for them. A planned development is defined under Section III of the ordinance as a "lot, parcel or tract of land which is developed as an integrated unit and contains two or more principal buildings". The ordinance also states that planned developments must be necessary, desirable, and appropriate with respect to the primary purpose of the development, and not be of such a nature or so located as to exercise a detrimental influence on the surrounding neighborhood. Exceptions to applicable bulk regulations are allowable in the case of a planned development if "the minimum lot-area-per-dwelling-unit requirements of this ordinance would not be decreased by more than 15 percent in any such development containing residential uses \* \* \*." It is conceded that the proposed 200 unit apartment complex does not exceed the R-3 area-per-dwelling unit limitations by more than 15%.

The proceedings below are not entirely free from ambiguity. Plaintiffs initially petitioned the village to rezone the subject property R-3 and apparently also requested planned development status so as to qualify for the 15% "bonus" factor under the planned unit development provisions of the village ordinance. The Plan Commission recommended that the subject property be rezoned R-3, and consistent with R-3 area-per-dwelling unit limitations, that plaintiffs be limited to 170 units. The village counsel refused plaintiffs' application and the property remained zoned M-1. It is not clear from the record whether the village council's refusal to rezone to R-3 as recommended by the Plan Commission was due to plaintiffs' insistence on the bonus units in excess of R-3 limitations.

After denial of their application, plaintiffs brought the present declaratory judgment action. The initial complaint requested the zoning ordinance be declared unconstitutional and invalid as applied to the subject property and requested rezoning to R-3. During the trial, an amended complaint was filed alleging plaintiffs' proposed construction of the 200-unit complex, and requesting that the proposed use be allowed free from the restrictions of the village's zoning ordinance. The judgment of the trial court found the zoning ordinance confiscatory without any cor-

responding benefit to the public and allowed plaintiffs' specific proposed use. There was no mention either in the original complaint, the amended complaint, or the court's judgment order of the special use and planned development provisions of the village's zoning ordinance.

The village concedes that the subject property should be zoned R-3, but contends that the proposed use qualifies neither generally as a special use nor in particular as a planned development under the zoning ordinance. The village argues that the proposed use does not constitute a special use because there is no evidence that the construction of 200 dwelling units on the property, rather than the number of units permitted under an R-3 zoning district, is necessary for the public convenience; and additionally that the public safety and welfare will not be protected by constructing the 200 units because of potential fire-safety problems. The village also argues that the proposed use does not constitute a special use because the apartment complex is not something of unique character but rather something contemplated under the R-3 classification. The village concludes that its refusal to rezone was therefore proper and the trial court's judgment should be reversed.

Plaintiffs devoted most of their brief to demonstrating from the evidence the invalidity of the village's zoning ordinance according to the traditional tests enumerated in *Hartung v. Village of Skokie* (1961), 22 Ill.2d 485, and other cases. Plaintiffs also argue that the special use and planned development standards were met; that the denial of a special use is subject to judicial review on constitutional grounds; and that plaintiffs need not show that their proposed use conforms to the special use provisions of the village's zoning ordinance. In oral argument counsel for the plaintiffs stated that while the plaintiffs do not have to show compliance with the ordinance standards, the fact that the proposed use does conform to the standards demonstrates the reasonableness of the proposed use.

■■ Although it is undisputed that the existing zoning classification is invalid, the question which was presented to the trial court and which is before this court is the reasonableness of prohibiting the requested use of plaintiffs' property. In testing the validity of the zoning ordinance in this case, we are only concerned with the validity of the ordinance insofar as it prohibits this proposed use. (*Schultz v. Village of Lisle* (1972), 53 Ill.2d 39, 42, 289 N.E.2d 614, 616; *First Nat. Bk. of Lake Forest v. Vil. of Northbrook* (1971), 2 Ill.App.3d 1082.) While the declaratory relief sought a rezoning to R-3, it also sought to void the village ordinance insofar as it prohibited the proposed use of the property for a 200 unit apartment complex. The latter relief was granted, upon which this appeal is taken.

■■■ Second, we are not directly concerned whether the village properly or improperly determined that plaintiffs' proposed use failed to qualify as a special use or planned development. The decision of a municipal zoning authority constitutes a legislative act and ordinarily is subject to review only on constitutional grounds. (*Columbus Park Congregation v. Bd. of Appeals, Chicago* (1962), 25 Ill.2d 65, 70, 71.) The fact that a special use was denied does not impair plaintiffs' right to test the effects of the denial by the traditional standards of reasonableness which govern review of zoning ordinances. (*Pioneer Trust & Sav. Bk. v. McHenry Cty* (1968), 41 Ill.2d 77; *Hartung v. Village of Skokie* (1961), 22 Ill.2d 485; *Elmhurst-Chicago Stone Co. v. County of Kane* (1970), 129 Ill.App.2d 190.) The failure to fulfill one or more of the requirements of a special use ordinance will not necessarily justify denial of the proposed use if the prohibition of the proposed use is not required by the public health, safety, morals, or welfare, and if there is no adverse effect on adjacent properties. *Pioneer Trust & Sav. Bk. v. McHenry Cty* (1968), 41 Ill.2d 77, 81-82, 84-87.

■■■ The traditional tests to review zoning determinations are well known. They include such factors as the character of the neighborhood and existing uses and zoning of nearby property; the depreciation of surrounding property values likely to result from the proposed use; the value of the proposed use to plaintiff (hardship) as compared to the gain to the public if the property remains restricted, that is, the basis of the restriction in public health, safety, and welfare, which includes consideration of the care with which the community has undertaken in planning its development. (*Pioneer Trust & Sav. Bk. v. McHenry Cty* (1968), 41 Ill.2d 77, 85; *Hartung v. Village of Skokie* (1961), 22 Ill.2d 485, 493-495; *Schiffer v. Village of Wilmette* (1969), 105 Ill.App.2d 80.) The person attacking the ordinance has the burden of demonstrating its invalidity and must prove by clear and convincing evidence that the zoning ordinance is, as to him, arbitrary and unreasonable and without substantial relation to public health, safety, morals or welfare. *Schultz v. Village of Lisle* (1972), 53 Ill.2d 39, 42, 289 N.E.2d 614, 616; *Hartung v. Village of Skokie* (1961), 22 Ill.2d 485.

The application of the traditional tests in large part is comparative. For example, hardship on the plaintiff depends upon what uses the plaintiff's property is limited if his proposed use is denied. Since the village concedes on appeal that the subject property should be zoned R-3, the true issue becomes the reasonableness of restricting plaintiffs to the 170 or so units contemplated by R-3 area-per-dwelling unit limitations as compared with the 200 units plaintiffs propose to construct. (*Cosmopolitan Nat. Bk. of Chicago* (1961), 22 Ill.2d 367; *First Nat. Bk. of Lake*

*Forest v. Vil. of Northbrook* (1971), 2 Ill.App.3d 1082.) The testimony at the trial court will only be considered as it is pertinent to this narrow issue, and not as it relates to the invalidity of the underlying M-1 classification of the subject property.

Plaintiff's first witness was a general contractor and beneficial owner of the subject property. He testified that the buildings would be four stories high and that plaintiffs were encouraged by the village to go high and leave as much green area as possible from the standpoint of esthetic development. He stated the buildings would be structural steel skeletons with masonry exterior and poured concrete floors over bar joists. As to traffic, the witness stated studies indicated that because of proximity to a railroad depot, there would be far less traffic movements generated by the proposed use than normally would be the case. Also the witness pointed out that Wooddale Road (to which Division Street immediately leads) is being enlarged to four lanes. One of the proposed buildings, each of which is 40' high, would be approximately 40' away from an undeveloped piece of property zoned R-1 (single family residence).

Mr. Thomas Collins, a real estate broker and appraiser testified that the highest and best use of the subject property is for a high density residential site. The witness noted there were a number of apartments zoned in the village in the past few years, some of which exceeded low-rise proportions, and one which was in excess of 10 stories although surrounded by much open land in the form of a golf course. The subject property was characterized as a unique parcel in the DuPage County area in that few communities in the county have any amount of open land close to the town center available for such a use; and that the subject property was ideally suited for multi-family use. Mr. Collins testified that the traffic generated by the 200 units would not create serious health or safety problems. Concerning access to the subject property, Division Street was classified as multiple family or potential multiple family, and the witness noted that almost every community in DuPage County having any amount of multiple family housing has apartment complexes with access of similar nature as that of the subject property. As to fire hazards because of limited access, he testified that there is plenty of room on the property itself to provide on-site roadways and access ways to Division Street. Mr. Collins said that the density of the subject property, 25 units per acre, is low-density by today's standards considering the subject property is located in the heart of town across the street from a commuter station to downtown Chicago; and that it is not uncommon for many of the communities such as Elmhurst, Wheaton, Lombard, and several others to have adopted high-density multiple family ordinances where the density has reached 40 units per

acre and higher. These towns were said to have reclassified to high-density zoning in the center of town with a view to possible revitalizing the business interests of the town. The witness concluded that the present value of the subject property (zoned M-1) is $160,000, and under the proposed use would be $350,000, and that the proposed use would be a benefit to the community in many ways, including the tax base.

. Another expert for plaintiffs, Mr. Don Neuses, testified the highest and best use of the subject property would be a planned unit development for multiple family residences. His definition of highest and best use included the greatest net return in property value as well as net return to the community and general need in the community for the proposed use. The witness acknowledged there would be an increase in traffic in the area, but the proximity of the railroad depot and local stores would mitigate the amount. Mr. Neuses considered the density of the proposed use of the subject property low, since it is situated close to the main part of town, and pointed out the village of Lombard had recently altered its density in downtown areas to 43 units per acre with unlimited height restrictions. The witness stated the proposed change would not diminish surrounding property values and that even a 4-story 40' high building abutting single family residence property would not result in diminished value if properly planned as in this case. The property was estimated worth $300,000 under the proposed use and only $200,000 under existing zoning.

All of plaintiffs' expert witnesses testified that the proposed use would not impair air or light to adjacent properties, would not increase fire or other dangers, would not impair the taxable value of land in the community, and would not increase storm-water run-off hazards.

Defendant's witness, Mr. James Dunn, testified the highest and best use would be multiple family, and by using the village's standards, R-3 zoning would constitute high density. Because of limited access, the witness stated that the maximum number of units the property can accommodate would be in the neighborhood of 136 units; that based on the witness's familiarity with density in other towns, 17 units per acre is appropriate. Based on comparative figures from other towns, the value of the property at 136 units would be $272,000 or $2000 per unit. Mr. Dunn testified the 200 units proposed would be an overdevelopment; that too great a density might require additional access, which because of the density and traffic would possibly have a detrimental effect on $60,000 homes to the south; and that there might be a restriction on adequate light, pure air, and safety from the proposed use because of the 200 units in a cul-de-sac street. On cross-examination, the witness admitted the subject property could not be seen from the street on which the $60,000

homes are located; that the one house viewing the subject property from the west is very modest (less than $10,000); and that on adjacent R-3 property the density is 24 units per acre. When pressed on how the figure of 25 units per acre constituted an overdevelopment, the witness stated the figure was based on remaining green area and his experience and familiarity with other village densities. However, the witness noted that Lombard has R-5 zoning, planned development with unlimited density, which was adopted with a view of revitalization of the central shopping area; that a high-rise building in Lombard abuts a residential area; that one of the communities he referred to in basing his 17 units per acre figure has recently adopted a master plan allowing higher densities for high-rise apartments; and that in general the higher the building the greater the green area that could be left for esthetic development.

Defendant's last witness, Jack Haynes, a fire protection engineer and member of the village fire department, testified that ingress and egress of the proposed use should be improved; that the inability of fire trucks to get to the back of all the buildings to evacuate people from the fourth floor and fight a fire constituted a life-safety hazard, and a fire hazard. The witness also visualized that at 5:00 P.M. due to nearby traffic congestion, difficulty would be encountered in getting access to the area in case of fire. On cross-examination it was developed that only portions of two of the five buildings could not be reached by fire fighting apparatus which required paved access to evacuate persons in the buildings.

■■■ Admittedly the case is a close one because of the presumption of validity accorded to defendant's zoning ordinance in prohibiting the proposed use (*Schultz v. Village of Lisle* (1972), 289 N.E.2d 614, 615; *Camboni's, Inc. v. DuPage County* (1963), 26 Ill.2d 427, 432) and the narrowness of the issue involved. However, we conclude that the testimony sufficiently supports the trial court's finding that the prohibition of the proposed use is unreasonable and confiscatory without any corresponding public benefit.

There was little evidence on the hardship plaintiffs would suffer if they were limited to R-3 standards. Accepting Mr. Dunn's figure of $2000 per unit, plaintiffs would suffer approximately $50,000. On the other hand, there was very little persuasive evidence that indicated plaintiffs proposed use should be prohibited. Plaintiff presented two experts who testified the highest and best use of the property was that proposed. The proposed use was characterized as low-density, although it was repeatedly acknowledged that there is a trend both in the village and other similar communities toward high-rise and high-density struc-

tures. Significantly, an adjacent property contains apartments in the same density as that proposed. Further, testimony indicated the proposed use is designed to maximize green area, a factor permitting higher densities.

Mr. Dunn's testimony that the proposed density of 25 units per acre constituted an overdevelopment was based on limited access, increased traffic, remaining green area, and reference to other communities. His testimony was mitigated by several factors. He spoke largely in possibilities while plaintiffs' experts were more certain. The proposed use was designed to increase green area. The trend in other communities was toward higher density housing in centrally located areas. The concern for limited access and increased traffic was directly contradicted by plaintiff's experts who also took into consideration the proximity of local stores and the commuter depot. The possible detriment to the $60,000 homes to the south was apparently based on the assumption that an additional right of way would extend south causing increased traffic to pass by these homes. However, the proposed use contemplates only access to the west along Division Street so that traffic flows would not affect the $60,000 residences.

Jack Haynes' testimony that the limited access constituted a life-safety hazard must be weighed against the testimony of plaintiffs' experts that there is no fire hazard and that there is plenty of space for access-area to the buildings for fire fighting apparatus. Also significant is the fact that many apartment complexes in the DuPage area have similar modes of access; that village fire regulations will be complied with; that the buildings are primarily steel and stone; and that the fire trucks can reach all the buildings, and almost all parts of all the buildings.

Not to be overlooked is the fact that the proposed use would have beneficial effects on the community. Testimony indicated the proposed use would have beneficial tax effects, could be helpful in a revitalization of the downtown area, and would be a convenience to commuters.

Finally, we note that the village allows as planned developments densities similar to that proposed. The trial court testimony indicates plaintiffs have made a strong showing that their proposed use fulfills the literal requirements of defendant's planned development scheme. The proposed use, consisting of five uniform buildings with a swimming pool and recreational building, fits the village definition of planned development as a "tract of land which is developed as an integrated unit and contains two or more principal buildings." It is clear from the ordinance, that unlike other special uses, planned developments include residential uses and specifically allow exceptions to applicable "residential" bulk regulations. Public convenience is promoted by the proposed use because of its benefit to commuters and possibilities of revitalization to central

Wood Dale. The property was characterized as a unique parcel ideally suited for the proposed use, and there was testimony that the highest and best use of the subject property, taking into consideration the general need and net return to the community, was the use proposed. Plaintiffs' literal compliance with the special use and planned development provisions of the village ordinance constitutes an additional factor demonstrating the arbitrary and unreasonable nature of the prohibition of plaintiffs' proposed use by the village zoning ordinance.

We conclude that the judgment of trial court was correct in finding defendant's zoning ordinance invalid as applied in prohibiting plaintiffs proposed use. The judgment below should therefore be affirmed.

Judgment affirmed.

T. MORAN and GUILD, JJ., concur.