LA SALLE NATIONAL BANK *et al.*, Plaintiffs-Appellants, *v.* COUNTY OF LAKE, Defendant-Appellee.

(No. 74-12;

Second District (1st Division)—March 21, 1975.

12

Winston & Strawn, of Chicago (Richard J. Brennan, and Ellen C. Newcomer, of counsel), for appellants.

Jack Hoogasian, State's Attorney, of Waukegan (Michael M. Sieman, William Sachen, and Rudy F. Magna, Assistant State's Attorneys, of counsel), for appellee.

Mr. JUSTICE GUILD delivered the opinion of the court:

The plaintiffs, who are the title holders of record under a land trust, the agent under the land trust and the contract purchaser of the land in question, filed a multicount complaint for declaratory judgment in the trial court. The complaint essentially sought various forms of relief which would permit the building of a planned-unit development consisting of 183 acres of the existing 255 acres of land now the Antioch Country Club. The trial court dismissed the plaintiffs' complaint for declaratory judgment and other relief, and this appeal followed.

The issue before this court is whether the denial of the special-use permit and whether the existing zoning classification as applied to the subject property is so arbitrary, capricious and unreasonable that it denies the plaintiffs due process of law.

The subject property is that portion of the Antioch Country Club which lies directly south of Grass Lake Road and directly west of Illinois Route 59. The property is in the Chain-of-Lakes region of Lake County and is located 16 miles west of Lake Michigan, 54 miles from Chicago and 2½ miles south of the center of the Village of Antioch. 188 acres are developed as an 18-hole semi-private golf club. There is a clubhouse, a swimming pool and tennis courts presently on the site. A portion of the property fronts on a channel that connects Bluff Lake and Petite Lake at the southwest corner of the property.

The planned-unit development would consist of a variety of housing including single-family homes, garden apartments, townhouses and low-rise apartments and a proposed commercial area to be located at the southwest corner of the intersection of Grass Lake Road and Route 59. The golf course would be retained as an integral recreational feature of the plan. A 2-acre site on the property would be devoted to a sewage-treatment plant. This site would be totally surrounded by the golf course and screened from view. The plant proposed would be donated to the County and operated by the County until it would be phased out when an interceptor sewer would be constructed on Route 59. At the time of the sewer connection the developer, at his expense, would run the interceptor line north in Route 59 to the south line of the project, and the developer would install a forced main from the treatment plant to the interceptor. When this was done the proposed treatment plant would

be disassembled. At the request of the Lake County Director of Public Works, the design of the treatment plant was changed so that it would be able to be dismantled and used elsewhere by Lake County after the plant was removed from service.

Lastly, a small marina and clubhouse would be built at the southwest corner of the property at the channel which connects Bluff Lake and Petite Lake. Additionally, recreational areas other than the golf course would be provided throughout the property.

Essentially, the subject property is bounded on all sides by single-family residences or areas zoned urban residential (UR-3) providing for single-family and multifamily homes.

The planned-unit development would provide for a convenience center located at the northeast corner of the property at the intersection of Grass Lake Road and Route 59. The other three corners at this intersection are presently zoned highway commercial (HC) under the county ordinances.

The principal portion of the Lake County Zoning Ordinance involved in this case is found in article four, section IV—Planned Development (a conditional use). This ordinance describes in detail the procedure that must be followed in seeking a conditional-use permit for a planned-unit development. The ordinance requires pre-application conferences with the Planning Commission, Health Department, Public Works Department, Building and Zoning Department, Highway Department, Lake County Soil and Water Conservation District, and school districts. Application for a planned-unit development is made on forms supplied by the Planning Commission and then submitted to the staff of the Planning Commission who initially determine whether the application is in proper form. The initial application may be an "outline development plan" or a "preliminary development plan." The data required in the outline development plan is not as detailed as that required in a preliminary development plan. The Planning Commission reviews the plan and forwards the same with a written report recommending that the plan be approved, approved with modifications or disapproved, and it must give reasons for its recommendations to the Zoning Board within 90 days after receipt of the plan. The Zoning Board, upon receipt of the Planning Commission's report, then conducts a public hearing and within 90 days after its hearing it must approve, approve with modifications, or disapprove the plan and make its recommendation to the County Board. The County Board shall then approve, approve with modifications, or disapprove the plan. Within 1 year following the approval of the preliminary development plan by the County Board, an applicant must then submit a final development plan to the Planning

Commission which, in turn, reviews the same and certifies to the County Board that it is in substantial compliance with the preliminary development plan. If it is not, it is referred back to the Zoning Board for a public hearing.

In the case before us the plaintiffs followed all of the above procedures and the Planning Commission approved the plan with certain agreed upon modifications. The Planning Commission then approved the Antioch Country Club Planned Development and so notified the Zoning Board. The Zoning Board then held the required public hearings and adopted a resolution recommending that the plan not be approved and denied plaintiffs' request for a conditional-use permit for its preliminary development plan, stating:

> "Inasmuch as this Board was established to represent the people of Lake County, it felt that the overwhelming objections offered to this proposal should be of prime consideration in making its decision. The Board is of the opinion that a planned development at this location is premature at this time."

The Lake County Board of Supervisors subsequently adopted a resolution denying plaintiffs' request for a conditional-use permit for a preliminary development plan, and, following the trial court's dismissal of plaintiffs' complaint for declaratory judgment, this appeal followed.

■■ At this point it is to be noted that the Planning Commission directed the plaintiffs to meet with school districts Nos. 33, 36 and 117. Plaintiffs did, in fact, meet with these school districts and made an offer of cash contribution. Two of the school districts rejected the offer. The school districts obtained leave to intervene in the trial court but were subsequently dismissed out. None of the intervenors has perfected an appeal from the order of dismissal. It is expressly to be noted in connection with this issue that the supreme court has recently ruled on the validity of a requirement that a developer contribute cash or property to a school district as a condition to obtaining a variance or a special-use permit. See *Duggan v. County of Cook* (1975), 60 Ill.2d 107, 117, where the court specifically held:

> "We also concur that there is no power under the guise of zoning authority to require the payment of a sum of money to a school district as a condition of the zoning."

See also *Rosen v. Village of Downers Grove* (1960), 19 Ill.2d 448, 453-54, 167 N.E.2d 230, 234; *Pioneer Trust and Savings Bank v. Village of Mount Prospect* (1961), 22 Ill.2d 375, 176 N.E.2d 799.

The plaintiffs attack the denial of the special-use permit on two grounds: (1) that the denial of the special-use permit itself was so arbitrary and capricious that it denied plaintiffs due process of law,

and (2) that the underlying zoning is unconstitutional as applied to the property.

The County contends that the County Board's decision to deny the permit, a legislative decision, cannot be reviewed by this court as the County Board need not follow precise standards. Rather, they argue, the plaintiffs can only question the decision by attacking the underlying zoning as being unconstitutional as applied to the property.

■■ We agree with the County that under *Kotrich v. County of Du Page* (1960), 19 Ill.2d 181, 166 N.E.2d 601, the granting of a special-use permit is a legislative decision and thus the County does not have to follow set standards or have precise standards. However, it does not follow that a legislative determination is not reviewable by the courts. This issue was raised in *Duggan v. County of Cook* (1975), 60 Ill.2d 107, 115-116, where the court held:

> "We have stated, in *Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill.2d 77, 84-85, that the determination to grant or to deny a special use permit is subject to judicial review. We further indicated that the property owner who seeks a special use must be afforded reasonable avenues of judicial review. If a court determines that the denial of a special use permit, including the conditions and restrictions suggested by the zoning procedures and record as a part of such permit, does not bear a real and substantial relation to the public health, safety, morals or general welfare, judicial relief must be granted."

In *Hartung v. Village of Skokie* (1961), 22 Ill.2d 485, 498, 177 N.E. 2d 328, 334, the court stated:

> "Where, as here, the application for a special use has been rejected, plaintiffs have the right to challenge the constitutionality of the underlying zoning classification."

It can thus be seen that the standard of review of the legislative determination by the County Board is the same in the case where a plaintiff challenges the denial of a special-use permit or where the plaintiff challenges the underlying zoning.

■■ However, there are differences between the two lines of attack. In judicial review of a denial of a special-use permit, the court is concerned with the constitutionality of the special-use denial insofar as it prohibits a particular use *as designed*. (*Cf. Kraegel v. Village of Wood Dale* (1973), 10 Ill.App.3d 486, 294 N.E.2d 64.) On the other hand, in an attack on the underlying zoning, the court is concerned with the constitutionality of the zoning insofar as it prohibits a particular type of use. (*Cf. Schultz v. Village of Lisle* (1972), 53 Ill.2d 39, 289 N.E.2d 614.) Thus, a finding by a court that a special-use permit should not

have been denied in effect recognizes that the proposed use as designed is compatible with the surrounding area; while a finding by a court that the existing zoning is unconstitutional as applied to the particular property in effect recognizes only that the type of use proposed would be compatible with the surrounding area.

Therefore, we may review the denial of the special-use permit without finding the underlying zoning unconstitutional. (*Pioneer Trust & Savings Bank v. County of McHenry, supra.*) Accordingly, we now turn to the question of whether the County's denial of the special-use permit bears a real and substantial relationship to the public health, safety, morals and general welfare.

As this court stated in *Kraegel v . Village of Wood Dale* (1973); 10 Ill.App.3d 486, 491, 294 N.E.2d 64, 67:

> "The traditional tests to review zoning determinations are well known. They include such factors as the character of the neighborhood and existing uses and zoning of nearby property; the depreciation of surrounding property values likely to result from the proposed use; the value of the proposed use to plaintiff (hardship) as compared to the gain to the public if the property remains restricted, that is, the basis of the restriction in public health, safety, and welfare, which includes consideration of the care with which the community has undertaken in planning its development."

However, the nature of the special use in the case before us—a planned-unit development—requires this court to consider added factors in reviewing the reasonableness of the denial of the special-use permit.

■■ In determining whether or not a denial of a special-use permit is arbitrary and unreasonable in that the denial bears no real and substantial relationship to the public health, safety, morals or general welfare, a court may take into account the fact that the special-use planned-unit development complies with any and all standards for special uses established by the county. Certainly a denial of a special-use permit for a use which complies with all of the established standards is an indication that such denial may be arbitrary and unreasonable. *Cf. Kraegel v. Village of Wood Dale, supra.*

However, we note that compliance with all of the standards required for a special-use permit does not necessarily mean that the denial of the permit is arbitrary and unreasonable. The nature of a special use does not make the issuance of a permit mandatory upon compliance with the county standards. (See *Herren v. Zoning Board of Appeals of Kendall County* (1972), 4 Ill.App.3d 342, 280 N.E.2d 463.) The granting of a special-use permit is not merely a ministerial function of a

legislative body. Rather, whenever a special use is proposed a legislative body must make an independent determination that the particular use in the proposed location is designed in such a way as to be compatible with the surrounding area. Whether a special use is compatible depends upon the circumstances of each case. In certain situations it is entirely possible for a special use to have no adverse effect despite its failure to comply with all standards. (See *Kraegel v. Village of Wood Dale, supra.*) In others, the special use may have adverse effects even though it complies with all of these standards. Therefore, any standards which a legislative body has passed beforehand can only serve as guidelines. To hold that prior standards are absolute requirements which must rigidly be adhered to would rob the special-use technique of its much needed flexibility. We must note again, however, that while strict adherence to the legislative body's own standards is not required of that body in passing on special uses, a legislative body must exercise its power in a reasonable way and adherence to these standards is a strong indication of reasonableness.

■■ In any event, the burden is on the plaintiff to prove by clear and convincing evidence that the denial of the special-use permit was arbitrary, capricious and unreasonable in that it bore no real or substantial relationship to the public health, safety, morals or general welfare. (*Kraegel v. Village of Wood Dale, supra.*) For the reasons stated below we find that the plaintiffs have sustained the burden of proof and that the denial of the special-use permit was arbitrary and unreasonable.

From the outset, we note that there is no objection raised as to whether the planned-unit development as designed is compatible with the surrounding area. The evidence clearly shows that any potentially incompatible aspect or use of the development is adequately buffered from the surrounding area and any traffic problems caused by the development have been minimized.

In this regard, we note that the County has contended that the plaintiffs have made no showing that there exists a public necessity for the development. Public necessity is relevant to determining the relative gain or detriment to the public caused by the development. For example, where a special use may have certain adverse effects on the surrounding area, these effects may be outweighed by the public necessity for the use so that there would be a relative gain to the public by allowing the special use. However, the Illinois Supreme Court has stated that the absence of public necessity alone is not sufficient to require the denial of the special-use permit. (*Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill.2d 77, 241 N.E.2d 454.) As this development is compatible with its surrounding area, it is not a detriment to the public,

and denying a special-use permit would not result in substantial gain to the public. Accordingly, we will not deny a special-use permit because there has been no showing of public necessity.

The next question raised is whether the plaintiffs have complied with the open-space provisions of the ordinance (art. four, sec. IV, par. D—3). Although there is no question as to the fact that the development adequately preserves the natural features of the site and provides for the functional, aesthetic and beneficial uses of the open areas in the retention of the golf course for recreational use, the County contends, and the trial court found, that there is no provision made for the continued preservation of the open space.

Under the plan the developer would retain ownership of the golf course and need only operate the golf course for a 5-year period. Both the trial court and the County suggest that the golf course should not be left in the hands of the developer but, in order to insure the continued operation of the course, be conveyed to the homeowners' association or to some public body. We find that these additional requirements would not substantially benefit the future residents of the development and thus the additional requirements are clearly unreasonable.

We fail to see how vesting ownership in the homeowners' association or a public body could more adequately preserve the golf course. The association or a public body would not be immune from the financial maladies associated with the operation of a golf course in these times of rising prices. To say one form of ownership could better prevent the cessation of golf course activities is mere conjecture.

Furthermore, we find no requirement in the special-use ordinance which requires that open spaces be always used for a particular sport or recreation. As long as open spaces are developed in such a manner as to be both functional and aesthetic, the requirements of the ordinance have been met. There is ample evidence that the open spaces and buildings are integrated in a manner that allows the open spaces, even in their natural state, to be both functional and aesthetic. Even if the open space were no longer used for a golf course, the land in its natural state is well suited for a variety of recreational uses.

■■ Certainly, and most importantly, the failure of the golf course would not relieve its owner from his duty to keep the land from becoming a public nuisance. Likewise, the failure of the golf course would not give the owner the right to convert the open spaces into another type of use (e.g., mobile home park) contrary to the provisions of the planned-unit development. Therefore, we find that the plaintiffs have made adequate provisions for the preservation of the open space in the proposed planned-unit development. To require more is unreasonable.

The next objection to the project concerns whether the development complies with the flood-plain regulations of the County Zoning Ordinance. Although some of the buildings are located on the flood plain, at trial, plaintiffs' engineer satisfactorily demonstrated that the buildings will be constructed and the land will be contoured in such a way as to comply with the flood-plain regulations.

The County, however, contends that detailed proof of compliance with the flood-plain regulations must be submitted prior to the consideration of the preliminary development plan by the County Board. The County argues that since the developer did not submit this proof before the County Board considered the preliminary development plan, the County Board properly denied the special-use permit. The developer, on the other hand, contends that such detailed proof need not be provided before consideration of the preliminary development plan but need only be submitted at the time the more detailed final development plan is under consideration.

The ordinance is ambiguous as to exactly when proof of compliance need be submitted and exactly how detailed the proof must be at the various stages of the planning process. The ambiguity is necessary, we believe, in providing the County and developer the needed flexibility in the preparation of plans for the planned development. When, and in what detail proof of compliance with the flood plain regulations must be submitted depends on the factual situation of each case. Where it is apparent that extensive work is needed to bring a plan into compliance with the flood-plain regulations or where there is a substantial question as to whether a planned-unit development can comply with the regulations, the County can request early and detailed proof of compliance. On the other hand, where it is apparent that the plan is in compliance, or will be in compliance after only relatively minor work, such proof may not be required or needed until later in the planning process.

■■ In this case, no request for detailed proof of compliance was made by any person connected with the planning process, although it was clearly evident that some buildings were in the flood plain. Thus, it is apparent that the County considered that the development's compliance with the flood-plain regulations was not a major problem and that detailed proof was not needed before consideration of the preliminary development plan. As plaintiffs' engineer has satisfactorily shown that the development can comply with the flood-plain regulations, we find that the plaintiffs have shown compliance with the flood-plain regulations.

The next objection raised concerns the commercial area located at the northeastern corner of the property. We find that this area meets all

of the standards set by the ordinance for shopping centers. It is planned as an integral part of the design of the planned development, and yet the residential areas within and without the development are protected from its adverse effects. Adequate provisions are also made to offset the added traffic and congestion. The County, however, contends that the commercial area does not meet the ordinance requirements for a convenience center and that no other convenience centers are provided for the development.

We find that requiring the developer to provide for an additional convenience center internally located in the project causes too great a hardship on the developer without comparable benefits to the residents and the general public and thus is unreasonable. A centrally located convenience center, which is not absolutely required under the ordinance, would be of little value to the residents of the development because of the close proximity of the proposed shopping center. Correspondingly, locating a convenience center within the development appears particularly difficult because of the adverse effects such a center would have on nearby residential uses. Therefore, we find that the denial of the special-use permit based on the ground that there are no convenience centers centrally located within the development is arbitrary and unreasonable as the developer has substantially complied with the ordinance.

The next objection raised is that there is inadequate provision made for other recreational activities. Specifically, the County contends that no provision has been made for playground facilities in the north end of the project, no provision has been made for an enclosed swimming pool and no specific plans have been made for the use of the proposed recreational and playground areas.

After a careful examination of the record we find that the developer has made adequate provisions for recreational facilities. Because of the nature of the development—an adult-oriented recreational community—there is no need for an abundance of playground facilities. There are three "formal" playground areas in addition to a large open area of undesignated open space in the center of the complex. Also, there are tennis courts and a swimming pool.

We also find that the developer has adequately designed the use of the recreational areas. The revised preliminary development plan shows the recreational areas as playground, sitting areas, shelters, tennis courts, ice skating, boating, swimming, swimming pool and fishing. To require the developer to detail the exact makeup of each area at this stage of the planning process is unreasonable.

■■ We note that although the developer has not provided for an

enclosed swimming pool, there is a swimming pool in the complex. Therefore, we find that there is an adequate provision made for recreational facilities and plaintiffs have complied with the ordinance in this regard.

The final objection raised is that the development does not constitute rational development in relation to the public services within the area. The County argues that the development is too far from existing limited-access highways, mass-transportation lines and other necessary public facilities such as hospitals, public libraries and postal stations. Certainly, providing for rational and orderly growth is an important part of the planning process and is a valid factor for a local government to take into account when making a planning decision. *Cf. Golden v. Planning Board of the Town of Ramapo* (1972), 30 N.Y.2d 359, 285 N.E.2d 291, 334 N.Y.S.2d 138.

■■ However, under the County's interim plan of 1969, the development is well within a planned corridor of high density urban development. Thus, as there is no contention made by the County that the development will cause such a sudden and substantial increase in the population of the area so that an intolerable burden will be placed on the existing public facilities, we cannot see how the development constitutes a danger to the orderly growth of the area.

■■ Therefore, we find the plaintiffs have substantially complied with all of the requirements of the ordinance. In this regard, we again note that compliance with present requirements of an ordinance does not automatically entitle a developer to a special-use permit. The County may impose additional reasonable conditions upon the developer in order to insure the public health, safety, morals and general welfare if the factual situation warrants. Thus, we conclude that the denial of the special-use permit bears no real or substantial relationship to the public health, safety, morals or general welfare. The special-use permit should be issued.

As we have found that the denial of the special-use permit itself is unreasonable and that the special-use permit should be issued, we need not consider whether the underlying zoning is unconstitutional as applied to the subject property. For the foregoing reasons the judgment of the circuit court of Lake County is reversed, and this cause is remanded for entry of an appropriate order not inconsistent with this opinion.

Reversed and remanded with directions.

SEIDENFELD, P. J., and HALLETT, J., concur.