LaGRANGE STATE BANK, Trustee, Plaintiff-Appellant, v. THE COUNTY OF COOK, Defendant-Appellee.—(SALVATORE TERRACINA et al., Intervenors-Appellees.)

First District (4th Division)    No. 62573

Opinion filed September 22, 1977.

Theodore J. Novak and William H. Martay, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Gregory J. Constantino, and Morris Alexander, Assistant State's Attorneys, of counsel), for appellee.

Edward Van de Houten, Jr., of Villa Park, for intervenors-appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, owner of record of the subject property, applied to the Board

of Commissioners of Cook County for a special use permit to allow construction on the property of an extended care nursing home facility. The property presently is classified under the Cook County Zoning Ordinance, as amended, as part of an R-3 Single Family Residence District. The Zoning Board of Appeals of Cook County, after a hearing, recommended that the special use be granted. The Board of Commissioners of Cook County without holding a hearing, none being required under its procedures, rejected the recommendation and refused to issue a special permit. Plaintiff thereupon filed a complaint for declaratory judgment against defendant, the County of Cook. Various nearby property owners were given leave to intervene as parties defendant. The trial court entered judgment in favor of defendants, and plaintiff appeals.

We reverse the judgment of the trial court.

The subject property is located in unincorporated Cook County, in Lyons Township, and consists of approximately 2.25 acres having 233 feet of frontage along the East side of Gilbert Avenue and a frontage of approximately 417 feet long the north side of 52nd Place. The property was purchased for $90,000 in 1972. It is vacant except for a 1½-story brick and frame single-family residence with a garage and shed that rent for $280 a month. The property is currently zoned R-3 Single Family Residence District. Under present zoning, an extended care nursing home facility is permitted as a special use.

The area surrounding the property consists of single-family homes except for 35 acres to the north which is occupied by the Community Memorial General Hospital campus. The hospital building itself is physically in the Village of LaGrange. The hospital building and campus is in an "A" zoning classification permitted under the zoning laws as a planned unit development. Just north of the hospital is a recently constructed four-story professional office building. Expensive single-family homes are adjacent to this building.

The proposed use for the property is to construct and operate a four-story extended care nursing center containing approximately 165 patient beds. Each floor will be 13,000 square feet and the building will cover 12 percent of the site. Parking will be provided for approximately 83 cars and will cover 26 percent of the site. The site will be entirely landscaped and screened to the east and south. The building will be completely fire resistant and will meet all Federal Housing Authority standards as well as the standards of the State Department of Health.

Across from the property and to the south are older homes. Each home is currently valued at approximately $40,000. Two of these homes face on the rear portion of the site. Across Gilbert Avenue is the Springdale subdivision in the Village of Western Springs. Homes there are valued in

the $75,000-$100,000 class. There is a stockade fence along all of the western side of Gilbert Avenue.

The plaintiff's evidence consisted of the following:

G. Grant Dixon, Jr., who with his brother are beneficiaries of the land trust which holds title to the subject property, testified that the trust has an agreement with Americana Health Services Corp. (Americana), for Americana to operate an extended care nursing home facility on the property for a period of 30 years. The agreement is subject to the plaintiff obtaining a special use zoning permit to allow the building of the facility on the subject site. The revenues from the lease would be $250,000 to $300,000 a year. Americana has no written contract with Community Memorial General Hospital relating to the servicing of patients discharged from the hospital. On cross-examination, Dixon stated that the subject property has not been listed on the open market for sale, but he has received inquiries about it.

William K. Poroske, vice-president of American Health Care Corp., which is associated with Americana, testified for the plaintiff. He stated that Americana manages 2,000 nursing center beds and eight hospitals, and that the community is best served when an extended care facility is on a medical campus. There are 16 Americana's in Illinois with four directly across from or adjacent to hospitals. Americana has a written agreement with these hospitals to transfer patients.

Poroske stated that the LaGrange area has a definite need for the proposed facility and that the subject property is a very suitable site. Professional studies and analysis indicate that even with the availability of the proposed facility, additional patient beds are needed to serve the community adequately. About 80 employees would staff the facility. Construction would cost approximately 3 million dollars. The floor area ratio is 0.5. The location would help reduce health care costs to the community. The patients would have their own private doctor on call at all times.

On cross-examination, Poroske testified that the building would be 43 feet, 7 inches high, buffered by a six-foot screen and trees. The building would be visible on a comparable level to the hospital. Americana desires a site within one-quarter mile from the hospital, and other sites in the area are not suitable. If a one-story building was constructed there would not be adequate sideyards, front yard or parking. The agreement with Americana leasing the facility is contingent on the special use permit issuing so as to have the proper zoning for the erection and use of the facility.

Donald W. Wikan, president of Cemcon, Ltd., an engineering firm, stated that he was the village engineer and Building Commissioner for LaGrange, Illinois, the community to the north. The proposed facility

would comply with the Metropolitan Sanitary District drainage ordinance even though it is not required to comply since the site is under five acres. The existing utilities are adequate. There would be no adverse effects on the adjoining property owners from a utility standpoint. In fact, there would be a benefit since storm water runoff would be reduced.

Thomas J. Buckley, a city planning and zoning consultant, testified that the professional office building, which takes up 23 acres, is an integral part of the hospital campus. The "highest and best use" means the physical site itself, suitability for the contemplated use, size access, compatibility of the property with the surrounding area and its impact on overall growth, the general welfare of the citizens and the greatest economic return to the owner. While the character of the area is single-family residential, that in consequence of the existing large medical complex, the highest and best use for the subject property is the proposed facility. He stated that he did not believe the proposed use would be detrimental to the surrounding property or detract from the land values. The proposed use would not impede the normal and orderly development of the surrounding property since the surrounding area with but few exceptions is fully developed. Even with the medical complex being there, new, expensive, single-family homes have been constructed. The proposed special use is a logical extension of the medical complex.

The LaGrange ordinance allows a maximum of 100 feet in height. The floor area ratio of the proposed use is .5 with .75 allowed. Height is not controlled under the Cook County ordinance. Buckley believed that the proposed use is a well-planned, desirable facility which would benefit patients and the community at large. The facility would have a tax benefit 15 times greater than if developed with a home on each of four single-family lots since the facility would have a construction cost of between 2½ to 3 million dollars as opposed to approximately $200,000 construction cost of four single family homes.

Paul C. Box testified that he is a traffic engineer and prepared an analysis of traffic impact. The peak traffic period would occur from 2:30 p.m. to 3:30 p.m. and at the shift change there would be 40 vehicles entering and 40 vehicles leaving. There would be a considerable surplus of parking since the site has 80 spaces. The county ordinance requires only 62 spaces. Box believed that Gilbert Avenue, the main thoroughfare, could handle the traffic and foresaw no traffic problems with the site.

William A. McCann, a real estate appraiser, testified that in his opinion the highest and best use of the property is the proposed use. Among other factors, he considered the fact that during the last 20 years the medical facility has grown but has not impeded construction of high caliber residential property, $75,000 to $100,000 homes. If the property were

developed for single-family use the property value would not exceed $100,000, while the proposed use would give the property a value of $200,000. The proposed use would not be deleterious to other property values in the area, and there would be a tax benefit to the community. Also considered was the structure itself, which would occupy only a small percentage of the site. Additionally, the future plans of the hospital call for the development of a 6-story, 91-foot-tall building at the south end of the hospital contiguous to the subject property.

McCann further testified that the nearby office building had been constructed within the last two years. There would be a greater assessed valuation as a nursing home with no greater need for services. He doubted that there would be any adverse effect on the use and enjoyment of the surrounding properties. The hospital's strong influence has already been felt in the market, and the proposed use would not have a further deleterious effect. The proposed use will stabilize the use of the hospital site with only 12 percent of the ground area being covered which will afford a more open view than if developed for single-family use.

The defendant's evidence consisted of the following:

Thomas Fitzgerald, a city planning and zoning consultant, testified that the highest and best use would be single-family residential since the neighborhood is predominately single-family with a low profile. It was his opinion that the proposed use would be an intrusion and have an adverse effect on the neighborhood.

He stated that nursing homes can fit into residential areas but, in this case, this would not be a good use of the site since there are nonresidential uses about seven blocks away to the south. He acknowledged that nursing homes can be built to blend in with the neighborhood.

On cross-examination, Fitzgerald testified that he had visited the site once for two hours but did not actually stand on the tract of land. He stated that he was not certain of the hospital acreage, nor did he know the floor area ratio, the percentage of coverage, or the amount of open green or landscaped area for the proposed use. Fitzgerald admitted that there would be a larger tax return if the proposed use was constructed. Further he acknowledged that the homes west of the site would be buffered with a visual barrier of a stockade fence and a three-lane highway; the homes on the southeast corner of Gilbert and the house east of the site face south so they would not be visually effected.

Francis S. Lorenz, Jr., a licensed real estate broker and appraiser, testified that the highest and best use of the property would be for single-family residences because of the country-like atmosphere, and because the area is single-family except for the hospital. There are few remaining undeveloped lots. Lorenz stated that properties along 52nd Place would

be injured. Those along Willow Springs Road would be injured to a lesser degree. The site under the present zoning is suitable for four single-family homes.

On cross-examination, Lorenz testified that he had never appraised property within two miles of the subject site. He had not examined plaintiff's proposal in its entirety, but only part of it the day before trial. He further stated that he was not familiar with the hospital's future expansion, and that even a 91-foot tower on the hospital grounds would not affect his opinion of the character of the area. The value of the homes would be totally diminished, and the lots would also be diminished. He concluded that no other permitted use would be as good as single-family residential. There is no height requirement under R-3 single-family residence zoning. Permitted use under R-3 zoning could be developed with more height, building coverage and floor area ratio than the proposed use all without need for rezoning. Lorenz had no firsthand knowledge of the need for a nursing home in the area, and did not know if the utilities were adequate for the proposed use.

Various property owners who had intervened in the case testified that they relied on the R-3 zoning when they purchased their properties, that the proposed use would interfere with their enjoyment of the property, and that the proposed use would diminish their land value. They objected to any extended care facility on the subject property, since there would be more automobile traffic. Each had pledged contributions to the hospital, which they felt did not depreciate their values.

William Kupfer, a lieutenant in the Pleasantview Fire Prevention District, also testified for the intervenors. His district has jurisdiction over the subject site. The proposed building does not meet equipment requirements due to the curves in the driveway being too sharp, but this could be remedied by the removal of two parking spaces. Equipment could only get within 40 feet from the building and ingress would be blocked by automobiles trying to leave.

Timothy N. Sullivan, a real estate appraiser, testified that based upon the residential character of the area, the highest and best use of the property is for single-family residences as zoned. He stated that the proposed use would have a deleterious effect on the surrounding residential area. The homes east of the subject property would suffer a 15- to 20-percent decrease in value, and the houses to the south that face 52nd Place would suffer a 10-percent decrease. There would be an adverse effect upon property across Gilbert to the west but it would not be substantial. The hospital campus did affect the value of the homes on 52nd Place in that there was a minor decrease of 2 percent. The ordinance requires a setback of approximately 29 feet on the north side and 40 feet

from the south line, whereas the proposed plan only provides for a setback of 15 feet from the north and 24 feet from the south.

He acknowledged that before a permit would be issued the proposed building would have to comply with applicable regulations and codes and that the site plans are only preliminary. Sullivan further stated R-3 zoning allows other uses but the highest and best use is residential. He admitted that single-family development at this site would require landfill. It is feasible that under R-3 a larger improvement, in terms of bulk, could be constructed, and that a church might be taller than the proposed nursing home.

In rebuttal, plaintiff introduced the testimony of Percy Lewis and Paul C. Box. Lewis testified that he owned the fourth house east of the subject site, and had lived there for 40 years. He stated that the hospital had no deleterious effect, and perhaps even increased the value of his property. Having seen the proposal for the subject property, he did not believe that it would have a harmful effect on the neighboring property and he had no objection to the construction.

Box testified that in his traffic plan he had considered fire vehicle accessibility, and that Gilbert Avenue allows ingress and egress. Template tests indicated that all Pleasantview fire vehicles could move in and out. The vehicles can clear all curb lanes. The developers will add a driveway on the north side of 52nd Place back to the property line. The State Fire Marshal has approved the present plans.

Box added that the present plan does not provide a driveway on the east for fire access. Box asserted that the north side has more than sufficient width for a fire vehicle to go in and then back out.

The trial court concluded that the issuance of the special use permit was properly denied since the plaintiff failed to overcome the presumption of validity of the Cook County zoning ordinance as applied to the subject property, and that the ordinance bore a reasonable relationship to the public health, safety, welfare and morals. Therefore, the court entered judgment in favor of the defendants. In its order, the trial court stated, *inter alia*:

> "8. The Plaintiff's proposal is in conformity with the standards listed in *LaSalle National Bank vs. County of Cook*, 12 Ill. 2d 40, 46-47 (1957) and the Cook County Zoning Ordinance 6.9(f) with the following exceptions: the height, size and design of the proposed structure on the subject property will be injurious to the use and enjoyment of other property in the vicinity for single family residences, which is a purpose already permitted, and will substantially diminish and impair property values within the neighborhood."

86

OPINION

■■ The granting of a special use permit by the Board of Commissioners of Cook County is a legislative decision, and thus the County does not have to establish or follow set standards. (*Kotrich v. County of Du Page* (1960), 19 Ill. 2d 181, 166 N.E.2d 601, *appeal dismissed*, 364 U.S. 475, 5 L. Ed. 2d 221, 81 S. Ct. 243.) However, this legislative determination is subject to judicial review. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 324 N.E.2d 406; *Hartung v. Village of Skokie* (1961), 22 Ill. 2d 485, 177 N.E.2d 328.) In *Duggan*, our supreme court held:

> "We have stated, in *Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 84-85, that the determination to grant or deny a special use permit is subject to judicial review. We further indicated that the property owner who seeks a special use must be afforded reasonable avenues of judicial review. If a court determines that the denial of a special use permit, including the conditions and restrictions suggested by the zoning procedures and record as a part of such permit, does not bear a real and substantial relation to the public health, safety, morals or general welfare, judicial relief must be granted." 60 Ill. 2d 107, 115-16, 324 N.E.2d 406, 411.

In a judicial review of denial of a special use permit, the court is concerned with the constitutionality of the denial of the special use insofar as it prohibits a particular use as designed. (*La Salle National Bank v. County of Lake* (1975), 27 Ill. App. 3d 10, 325 N.E.2d 105.) Thus, a finding by a court that a special use permit should not have been denied recognizes that the proposed use, as designed, is compatible with the surrounding area.

■■ The standards of review of the legislative determination by the Board of Commissioners are the same in the case where a plaintiff challenges the denial of a special use permit as where the underlying zoning is in issue:

> "The traditional tests to review zoning determinations are well known. They include such factors as the character of the neighborhood and existing uses and zoning of nearby property; the depreciation of surrounding property values likely to result from the proposed use; the value of the proposed use to plaintiff (hardship) as compared to the gain to the public if the property remains restricted, that is, the basis of the restriction in public health, safety, and welfare, which includes consideration of the care with which the community has undertaken in planning its development. (*Pioneer Trust & Sav. Bk. v. McHenry Cty* (1968), 41 Ill. 2d 77, 85; *Hartung v. Village of Skokie* (1961), 22 Ill. 2d 485,

493-495; *Schiffer v. Village of Wilmette* (1969), 105 Ill.App.2d 80.) The person attacking the ordinance has the burden of demonstrating its invalidity and must prove by clear and convincing evidence that the zoning ordinance is, as to him, arbitrary and unreasonable and without substantial relation to public health, safety, morals or welfare. *Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 42, 289 N.E.2d 614, 616; *Hartung v. Village of Skokie* (1961), 22 Ill. 2d 485." *Kraegel v. Village of Wood Dale* (1973), 10 Ill. App. 3d 486, 491, 294 N.E.2d 64, 67-68.

■■ No one factor controls in determining the validity of the Board's action. It is not merely the loss in value that is significant, but the fact that the public welfare does not require the denial and resulting loss. When it is shown that no reasonable basis of public welfare requires the denial of the special use and the resulting loss, the presumption of validity afforded to the legislative determination fails. See *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65.

A review of the evidence in the present case convinces us that the public welfare does not require the denial of the special use. The addition of the extended care facility at the proposed site would complement the community hospital and complete yet another segment in a plan to meet the expanding health care needs of the community at large. The fact that an extended care facility is allowed as a permitted special use buttresses our conclusion that the proposed plan would enhance rather than deprecate the public welfare. Additional health services would be available to the public and an economic benefit to the community would be provided.

In contrast, the evidence adduced by defendant did not controvert the evidence that there was a need for a facility such as the one proposed. Rather, the testimony of its expert witnesses was to the effect that various property values might be diminished, that the proposed facility would produce greater traffic congestion, that it might prove to be inaccessible to fire-fighting equipment, and that setback ordinances were violated.

There was conflicting testimony at trial indicating that several homes near the proposed site might suffer a diminution in value. However, such a conflict in the evidence does not support the validity of the Board's action. (See *Stalzer v. Village of Matteson* (1973), 14 Ill. App. 3d 891, 303 N.E.2d 489; *Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 365 N.E.2d 433.) The record in this case indicates that the surrounding area is substantially developed, with few vacant lots remaining. The majority of the homes adjacent to the proposed site are already screened off by a stockade fence or face away from the site. The proposed facility would also be surrounded by extensive landscaping. It is to be noted that the hospital has grown over the past 20 years, but has

not impeded construction of expensive homes, or diminished the value of property. We fail to see how the addition of the proposed facility would thwart the appreciation of property values or cause their decline.

The evidence also indicated that peak traffic activity would occur during non-rush-hour periods, thereby not causing greatly increased traffic congestion in the area. The evidence pertaining to accessibility of fire fighting equipment was to the effect that minor changes in plans could eliminate any objections, and that the proposed plan had been approved by the State Fire Marshal. Thus, neither of these arguments are persuasive or add weight to defendants' position.

Insofar as setback requirements are concerned, the proposed plan would have to comply with pertinent regulations, or a variance would have to be obtained, before a permit would issue to allow construction. This is the case in all such proposals.

■■ The trial court, in its findings, stated that the basis for the denial of plaintiff's request for declaratory judgment was that "the height, size and design of the proposed structure on the subject property will be injurious to the use and enjoyment of other property in the vicinity for single family residences, * * * and will substantially diminish and impair property values within the neighborhood." As has already been stated, we do not believe that the proposed use would have such a deleterious effect upon either the enjoyment or value of property as to warrant denial of the special use. Other structures could be built under the existing zoning which could be of greater height and density, and not be as conducive to the character of the immediate area as the facility now proposed. The proposed facility would be four stories in height, which would not be an unacceptable intrusion upon the rights of adjacent property owners. Nor would it alter the character of the neighborhood. The hospital, with the planned 91-foot-tall addition, has already established a long-standing change in the character of the area. The proposed use would merely augment the nature of the neighborhood as comprising single family residential homes with a medical complex in its midst. We therefore must hold that the trial court erred in finding in favor of defendant and accordingly we must reverse.

Reversed.

DIERINGER, P. J., and ROMITI, J., concur.