(Nos. 47149, 47169 cons.—

THE COUNTY OF COOK *et al.,* Appellants, v. GEORGE J. PRIESTER *et al.,* Appellees.

*Opinion filed January 26, 1976.*

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner, Deputy State's Attorney, and Henry A. Hauser and Dorothy Kirie, Assistant State's Attorneys, of counsel), for appellant County of Cook.

Paul E. Hamer, of Northbrook, for appellant Village of Wheeling.

Arvey, Hodes, Costello & Burman, of Chicago (Charles J. O'Connor and Rosemarie J. Guadnolo, of counsel), for appellees.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The County of Cook (the County) instituted this suit seeking penalties and injunctive relief against the owners of Pal-Waukee Airport for alleged violations of certain conditions of an ordinance granting them a special use permit to extend an airport runway. The Village of Wheeling (the Village) was allowed to intervene and file a complaint which also sought injunctive relief against the alleged violations. Defendants filed a counterclaim seeking to have the conditions declared unconstitutional on various grounds. On motion of defendants, the Village was dismissed as a party for lack of standing at the close of plaintiffs' evidence, and at the conclusion of all the

evidence the trial court held that the conditions of the special use permit were unconstitutional and invalid. The appellate court affirmed. (22 Ill. App. 3d 964.) We allowed petitions for leave to appeal filed by the County of Cook (No. 47149) and the Village of Wheeling (No. 47169) and have consolidated the two appeals for disposition.

Pal-Waukee Airport is located in an unincorporated area in the northern part of Cook County southeast of the Village of Wheeling. An airport has been operated on a portion of the premises since 1925. When the original Cook County zoning ordinance was enacted in 1940, the airport property was classified as a permitted use within the farming classification and was included in an area described as "Designated Airport Area." The defendants, George J. Priester, Veta L. Priester, and Waukee Realty Company, Inc., purchased the airport property in 1953. The property was subsequently reclassified as M-1, Restricted Manufacturing District, with the airport designated as a permitted special use under such classification. In 1963, the defendants acquired an additional 109 acres and applied to the Zoning Board of Appeals of Cook County for a special use permit to extend runway 34/16 from 2,000 feet to 5,500 feet. After a public hearing at which the Village of Wheeling appeared in opposition to the proposed extension, the Board of Commissioners of Cook County adopted the findings and recommendations of the Zoning Board of Appeals and enacted an ordinance on March 16, 1964, which granted the defendants a special use to lengthen runway 34/16 subject to the following three conditions:

"(1) The NNW/SSE runway is not to be extended beyond a total length for the runway of 5,000 feet from the starting point of the present runway near Hintz Road.
(2) The NNW/SSE runway is to be constructed for a load-bearing capacity under regular service not to exceed 60,000 pounds.

(3) The landing and take off visual flight patterns for the extended NNW/SSE runway shall lie to the East of Wheeling as proposed by the applicant."

In 1970, the County of Cook filed a three-count complaint against defendants. Count I alleged violation of conditions 1 and 2 of the special use permit (length and load-bearing capacity of the runway) and sought an injunction prohibiting defendants from allowing aircraft weighing more than 60,000 pounds from using the runway and ordering defendants to conform to the specified runway length; count II sought penalties for violation of the runway length condition; and count III sought penalties for violation of the weight restrictions. The Village of Wheeling's petition to intervene pursuant to section 26.1 of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 26.1) was allowed, and the Village filed a complaint seeking injunctive relief to compel compliance with each of the three conditions of the special use permit. Defendants filed an answer denying violation of the three conditions and also filed a counterclaim seeking to have all three conditions declared unconstitutional and invalid. At the close of the evidence presented by the County and the Village, the two penalty counts of the County's complaint were dismissed for failure to prove the allegations beyond a reasonable doubt. On motion of the defendants, the trial court then dismissed the Village's complaint with prejudice on the grounds that the Village was without standing and had presented no evidence showing harm to itself or its residents. At the conclusion of the trial, the trial court held that the runway had not been constructed in excess of 5,000 feet and that condition 1 of the special use permit therefore was not violated; that condition 2 was invalid and unenforceable for various reasons, including violation of the commerce and supremacy clauses of articles I and VI, respectively, of the United States Constitution; and that condition 3 also violated the Federal supremacy clause in that it attempted to regulate

flight patterns which are within the exclusive jurisdiction and authority of the Federal Aviation Administration. An order was entered permanently enjoining the County from further attempting to enforce the ordinance conditions. The County appealed to the appellate court only from that part of the trial court's judgment declaring the weight restrictions of condition 2 invalid, and the Village appealed from the order dismissing its complaint for lack of standing. In affirming, the appellate court held that: (1) The weight restrictions of condition 2 were in contravention of the stated policies of both the Illinois Aeronautics Act (Ill. Rev. Stat. 1971, ch. 15½, par. 22.25) and the National Airport Plan (49 U.S.C. sec. 1301 *et seq.*) and furthermore violated the supremacy clause of article VI of the Constitution of the United States since the level of Federal regulation of air commerce by the FAA was so pervasive as to deprive other governmental bodies of the power to act in this area; (2) the weight restrictions constituted an improper attempt to regulate a business under the color of its power to regulate land use; and (3) the trial court properly allowed defendants' motion to dismiss the Village of Wheeling, since the Village had failed to show any harm or injury resulting from the alleged violations of the three conditions of the special use permit.

Before addressing the issues raised by the parties in this court, we deem it appropriate to summarize the evidence concerning the airport's location and the scope and nature of its facilities and operations. The airport is situated on a 250-acre tract southeast of the Village of Wheeling bounded by Palatine Road on the south, Wolf Road on the west, Hintz Road on the north and Milwaukee Avenue on the east. Runway 34/16 runs in a NNE-SSW direction so that aircraft taking off to the north or landing from the north fly over portions of the Village, although it appears that if aircraft taking off to the north made a right turn, they possibly could avoid passing over the Village's more heavily populated areas. O'Hare Inter-

national Airport is situated approximately 8 miles due south of Pal-Waukee, and Glenview Naval Air Station lies approximately 4 miles southeast of the airport.

Runway 34/16 is the longest of the three primary runways at the airport—the other two runways measuring 4,400 and 3,600 feet respectively. The useable takeoff and landing portion of runway 34/16 between the threshold markers is approximately 5,000 feet, which does not include the paved over-run and turn-around areas at each end of the runway which serve a dual purpose as blast pads to eliminate blowing dust and debris. The airport is equipped with Vasi lights (visual approach strobe light indicators), and is one of a limited number of airports with five-position, high-intensity runway lights. The airport also owns, operates and maintains fire trucks, snow removal machinery and various other equipment necessary for maintenance and operation of the airport on a year-round basis.

Although Pal-Waukee Airport is privately owned, it is open to use by the public and derives its revenues from aircraft maintenance, charter flights, military and civilian flight training, fuel sales and other services generally associated with the operation of an airport. It is primarily a general aviation airport serving privately owned aircraft used for business and personal purposes. Between 350 and 400 aircraft are based at the airport and most of these are aircraft used by corporations for business travel throughout the country. Approximately 16 are twin-engine jet aircraft, the largest of which is a BAC-111. Navy aircraft occasionally land at Pal-Waukee when nearby Glenview Naval Air Station is closed for air shows, weather conditions or runway maintenance, and both Army and Navy aircraft have landed at the field in emergency situations. Feeder airlines and commuter air carriers also operate in and out of the field when they are unable to land at O'Hare due to traffic congestion, adverse weather conditions or insufficient fuel. On such occasions, the

passengers are transported by bus between Pal-Waukee and O'Hare. The Civil Air Patrol also maintains a facility in its own building on the airport premises.

Of the approximately 5,000 airports in this country, Pal-Waukee ranks 51st in terms of general aviation and 95th in total operations. There was testimony that in 1971 there were 194,000 total operations of which 77,000 were nonscheduled itinerant flights originating and terminating at other airports throughout the country, 131 were military flights and 100 were air carrier operations. By way of comparison, O'Hare Airport had 34,000 nonscheduled itinerant flights during the same period.

Pal-Waukee is one of only three privately owned airports at which the Federal Aviation Agency operates a control tower, the other such towers being located at Burbank, California, and Addison, Texas. The tower was opened in 1967 since the airport met the FAA criteria of at least 50,000 annual itinerant aircraft operations and due to the need for air traffic control in the congested Chicago area. There was testimony that Pal-Waukee was ideally situated in relation to O'Hare Airport and Glenview Naval Air Station for this purpose. Traffic patterns at the three airports are interrelated and coordinated under the control of the FAA, which maintains direct communications between each location. Between midnight and 6 a.m. when the tower at Pal-Waukee is closed, aircraft using the airport receive clearances from the O'Hare tower. Prior to 1967 a right-turn traffic pattern was in effect at the airport. This was changed to a left-turn pattern when the FAA tower commenced operating that year. With respect to condition 3 of the special use permit providing that landing and takeoff visual flight patterns for runway 34/16 lie to the east of the Village of Wheeling, there was testimony that when using the runway for takeoffs to the north the condition could not be complied with during the hours the tower was closed without violating the standard left-turn pattern FAA air traffic regulations and that during the

time the tower was open the condition could possibly be met only if the FAA traffic controller authorized a right turn. One pilot testified that in any event it would be dangerous for jet aircraft to attempt what he termed the "sort of circus operation" which would be required to avoid flying over the Village of Wheeling when taking off to the north.

A number of witnesses testified to the importance of Pal-Waukee Airport not only in the Chicago area but on the national level as well. As the busiest airport in the world, O'Hare is able to serve only a limited number of general aviation aircraft and has reached its capacity in this regard. Pal-Waukee serves the important function of relieving O'Hare of this burden. According to one witness, Pal-Waukee is probably the only general aviation airport in the area that could handle the rapid growth and large number of business aircraft. The airport's function in this respect is recognized by the Federal government by its inclusion in the National Airport Plan which designates a network of airports deemed to be in the national interest. Pal-Waukee is listed in the plan as a reliever airport to O'Hare—the function of a reliever airport being to relieve congestion at a high-density airport serving scheduled air carriers by providing a nearby base of operation for general aviation aircraft which are acknowledged in the plan to constitute a vital component of air transportation and commerce. Pal-Waukee is also included in the National Airport Systems Plan, which is the successor document to the National Airport Plan. In the NASP, Pal-Waukee is classified as a "secondary airport" in the same category as the Detroit, Minneapolis and Milwaukee airports. The acting chief of the Airports Division, Planning Branch, of the FAA testified as to the general trend in business aircraft toward heavier, faster, higher performing and more sophisticated aircraft. He stated that the philosophy of both the NAP and the NASP was that there should be a smaller number of highly developed airports to serve such

aircraft rather than a proliferation of smaller, unsophisticated ones, and that it would be in the national interest to obtain the maximum utilization and operation possible from Pal-Waukee Airport in view of its importance in this area.

A civil engineer for the FAA testified that the weight-bearing capacity of a runway is measured in terms of pounds per square inch or per square foot. The amount of weight which a given aircraft exerts on a runway is dependent upon the weight of the aircraft, the configuration and number of the landing gears and the number of tires on each gear. As the number of tires increases, the weight is dispersed over a larger area, thus decreasing the amount of stress per square inch on the runway. For example, a Boeing 727 exerts more stress on a runway than the much larger and heavier Boeing 747, which has more tires. The evidence established that runway 34/16 was constructed in such a manner that an aircraft weighing 75,000 pounds with a nose gear and dual wheels on its two main landing gears could use the runway without exceeding its load-bearing capacity. It is conceded that four aircraft weighing in excess of 60,000 pounds use the airport regularly.

The parties differ on the meaning of the provisions of condition 2 that the runway "is to be constructed for a load-bearing capacity under regular service not to exceed 60,000 pounds." If, as the airport contends, the runway was to be constructed to withstand no more than 60,000 pounds per square inch, we would have to conclude that there is no evidence that this condition was violated. However, it is apparent from the proceedings before the Zoning Board of Appeals and that board's recommendations to the Board of Commissioners that it was intended that the runway was to be constructed to accommodate aircraft with a gross weight not in excess of 60,000 pounds. Accordingly, we so interpret the condition.

A former TWA pilot who piloted one of the corporate

jets stationed at Pal-Waukee testified that in his 36 years of flying experience throughout the world he knew of no airport which was subject to local ordinances placing weight restrictions on aircraft. Other witnesses in the fields of airport planning and administration testified to the same effect. An airport consultant, a former assistant commissioner of Development Planning for the city of Chicago, and the assistant manager of O'Hare Airport each testified that in their opinion the 60,000-pound weight restriction failed to recognize technological advances in the aviation industry and was unreasonable, inflexible and unduly restrictive. O'Hare's assistant manager further testified that enforcement of the weight restriction at Pal-Waukee would reduce its effectiveness as a reliever airport to O'Hare and could force additional burdensome traffic to O'Hare.

The manager of Pal-Waukee Airport testified that in 1971 the airport's net profit from all operations was approximately $40,000, which was less than 1% of gross business revenue. He testified further that a substantial source of gross revenue was sale of aviation fuel and that 35% of such sales were to owners of the larger jets which use the airport. Both he and the airport's controller testified that if aircraft in excess of 60,000 pounds were precluded from using the airport, the airport would operate at a net loss and might have to close.

A representative of the Wheeling Chamber of Commerce testified that the airport contributed to the economic growth of the community and that "it would be a disaster if anything happened to the airport—business-wise."

The State's police power provides the sole justification for the enactment of zoning ordinances which limit a property owner's privilege and right to use his property as he desires. (*Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill.2d 77; *City of Loves Park v. Woodward Governor Co.* (1958), 14 Ill.2d 623; *Hannifin*

*Corp. v. City of Berwyn* (1953), 1 Ill.2d 28.) Although a zoning ordinance is presumed valid, this presumption may be overcome by a property owner who shows by clear and convincing evidence that the ordinance as applied to him is arbitrary and unreasonable and bears no substantial relation to the public health, morals, safety or welfare. (*Westfield v. City of Chicago* (1962), 26 Ill.2d 526; *Cosmopolitan National Bank of Chicago v. City of Chicago* (1961), 22 Ill.2d 367; *La Salle National Bank of Chicago v. County of Cook* (1957), 12 Ill.2d 40.) Stated somewhat differently, the presumption of validity of an ordinance is overcome when it is shown that there is no reasonable basis requiring the restriction imposed and the gain to the public is small as compared to the hardship imposed on the property owner. (*Pioneer Trust & Savings Bank v. County of McHenry; Marquette National Bank v. County of Cook* (1962), 24 Ill.2d 497.) The application of the foregoing principles necessitates a consideration of the effect the particular zoning restriction has on the property owner and the public.

It is pertinent to consider the intended purpose of the weight restriction as of the time the ordinance was enacted in 1964, and in this regard, it is appropriate to review the findings and recommendations of the Zoning Board of Appeals upon which the Board of Commissioners acted. (*Duggan v. County of Cook* (1975), 60 Ill.2d 107; *Tillitson v. City of Urbana* (1963), 29 Ill.2d 22.) They indicate rather clearly that safety of the area was the principal, if not sole, factor leading to the recommendation that the three conditions be imposed. The zoning board specifically stated that no weight was given to the noise factor. The weight restriction itself appears to have been responsive to objections that a new runway might introduce "aircraft of formidable size posing dangers not associated with the light and medium aircraft commonly used in business and pleasure flying." It also appears that residents of the area had expressed concern that the runway might be con-

structed to withstand the weight of modern commercial jets which would make Pal-Waukee an adjunct of O'Hare. The findings and recommendations reflect that the weight restriction contained in condition 2 was intended to limit use of the airport in the future to the size of aircraft which were then utilizing the airport, the largest and heaviest of which were DC-3s and other propeller-driven aircraft of that type. We note that no jet aircraft were based at the airport at that time.

In our opinion, the evidence presented by the airport owners in this case was sufficient to overcome the presumptive validity of the 60,000-pound weight restriction contained in condition 2 of the special use permit. It was shown that gross weight is only one of a number of factors which determine whether an aircraft may safely operate at a given airport. The weight of an aircraft, by itself or in the context of the other conditions of the special use permit, bears no meaningful relation to the safety of residents in the area. There is little justification for the assumption that heavier aircraft present a greater hazard to the surrounding community than lighter planes. The converse would seem more likely in view of the sophisticated guidance and navigational systems incorporated in the newer aircraft which of common knowledge are often flown by pilots with more skill and experience than those flying lighter, lesser equipped planes. Since 1964 there has been a trend in general aviation aircraft toward smaller, heavier, highly advanced aircraft used for business travel which due to their high performance characteristics can operate on runways of 5,000 feet or even less. Since many of these aircraft exceed 60,000 pounds gross weight, the provisions of condition 2 would result in the elimination of a significant class of aircraft at Pal-Waukee on the basis of an arbitrary criteria. We also note that from the viewpoint of experts in the aviation field the weight restriction is unreasonable, unduly restrictive and fails to take into account technological advances

in the aviation industry in the direction of still heavier, short takeoff and landing (STOL) aircraft which can operate on even shorter runways than those at Pal-Waukee. It is also undisputed that enforcement of the condition would result in substantial loss to the airport owners and could affect their ability to maintain a viable business on the premises. In a broader sense, the restriction would operate to the detriment of the public in general by limiting Pal-Waukee's ability to serve as a reliever airport to O'Hare. For these reasons, we conclude that the trial court correctly held the weight restriction to be invalid and unenforceable.

We next consider the Village's contention that the trial court erred in dismissing it for lack of standing at the close of plaintiffs' evidence. The Village relies on section 7 of "An Act in relation to county zoning" (Ill. Rev. Stat. 1969, ch. 34, par. 3160) which provides in pertinent part as follows: "In case *** land is used in violation of this Act or of any ordinance, resolution or other regulation made under authority conferred thereby, the proper authorities of the county, or any person the value or use of whose property is or may be affected by such violation, in addition to other remedies, may institute any appropriate action or proceedings in equity to prevent such unlawful *** use, to restrain, correct, or abate such violation, *** or to prevent any illegal act, conduct, business, or use in or about such premises." The trial court in its written order held that the Village "is without standing in this court as a matter of law and has presented no evidence showing harm to itself or its residents ***." We concur with this determination. To come within the purview of section 7 of the county zoning act it was necessary that the Village show in some manner that the value or use of its property was or might be "affected" by the alleged violation of the conditions of the zoning ordinance. This it failed to do.

The Village also contends that it was taken by surprise by the trial court's ruling as to its lack of standing and that

the trial court should have permitted it to amend its complaint so that it could allege and thereafter prove the requisite elements establishing that it was an "affected" party within the meaning of section 7 of the county zoning act. In its answer to the counterclaim filed by the airport owners, the Village specifically alleged by way of defense that "the use of the larger aircraft and the changes in flight patterns, not only contravenes the aforementioned limitations but are detrimental to the health, welfare and comfort of the citizens of the Village and diminishes the value of their property." In view of the matters already alleged, we conclude that the trial court did not abuse its discretion in denying the Village's motion to file an amended complaint. We also find no merit to the Village's contention that the actions of the trial court deprived it of a remedy for injuries and wrongs in contravention of section 12 of article I of the 1970 Illinois Constitution.

The County and the Village each argue that the defendants should be estopped from challenging the validity of the conditions of the special use permit since they applied for the permit and accepted its benefits. This issue was not raised by the County in its pleadings in the trial court, and apparently for that reason the question was not considered by the appellate court. That issue is clearly not preserved for review here on the County's appeal in No. 47149. While it appears that the Village may have timely raised the issue in the trial court, we find it unnecessary to reach it here on the Village's appeal in No. 47169 in view of our conclusion that the Village's complaint was properly dismissed for lack of standing.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*