NATIONAL PRIDE EQUIPMENT, INC., Plaintiff-Appellee, *v*. THE VIL-LAGE OF NILES, Defendant-Appellant.

First District (5th Division)   No. 81—2484

Opinion filed September 29, 1982.

Sneider and Troy, of Chicago (Richard J. Troy and Randy G. Black, of counsel), for appellant.

Jack Guthman, Gerald L. Angst, and Sara J. Gourley, all of Sidley & Austin, of Chicago, for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant appeals from an order in a declaratory judgment action granting plaintiff's request for a special use permit to construct and operate a self-service car wash and declaring the zoning ordinance of defendant unconstitutional as applied to plaintiff's property.

It appears that plaintiff applied for a special use in a B-1 (retail business) zoning district for the purpose of constructing and operating a self-service car wash. The property involved has a frontage of 250 feet on Dempster Avenue and a depth of approximately 130 feet. To the immediate east of the property is a Ponderosa restaurant and adjoining thereto is a small shopping center; to the west of the site is a one-story brick building used as a construction office, next to which are an appliance store and a medical clinic; adjacent to the south are several three-flat apartment buildings; across Dempster to the northeast is a commercial center, and to the northwest is an area of single-family residences. Plaintiff's plan called for a one-story, self-service car wash facility with 14 washing bays and space for three cars in a "stack" or waiting position behind each bay. The 26-foot-long building was to be located approximately 62 feet from the north lot line on Dempster and 42 feet from the south lot line. Outdoor vacuum equipment was to be provided in the stacking area and, directly south of the facility, a driveway exit from the bays and angle parking for a drying area. The plans also called for a 5-foot-wide row of shrubbery along the south and west boundaries, to separate the site from the residential property. The facility was to be operated from 7 a.m. to 11 p.m., 7 days a week, 52 weeks a year.

After the board of trustees of defendant denied the special use permit, plaintiff brought this action for a declaration that the ordinance was illegal and void as applied to it and to enjoin defendant from interfering with its use of the property.

At trial, Steven Hirsch, plaintiff's chief executive officer, testified that there are currently 16 facilities of plaintiff in the Chicago metro-

politan area and 7 in the Rockford area; that the Niles operation will involve a "fully manned self-service operation" including coin-operated vacuum and washing facilities; that according to market research studies, 90% of plaintiff's customers will not use a tunnel-type automatic car wash as an alternate method of washing their cars; that prior to leasing the subject site, he determined that there was no self-service car wash within 10 miles of the site; that if he is unable to proceed with the use, there will be an investment loss to plaintiff of $42,000; and that, at the time he leased the property, he was aware that he needed a special use permit from defendant.

Neil Kenig, a transportation consultant, testified for plaintiff that based upon his familiarity with the operations and traffic flow at other facilities and his investigation of their traffic patterns, that "National Pride is a very low traffic generator"; that the proposed facility "would have minimal impact on the traffic and on the adjacent street system"; that many of the permitted uses in the district zoned B-1 "would generate significantly higher traffic volumes than the National Pride car wash"; that plaintiff's peak hours occur on weekends, when the adjacent street traffic is at a reduced level; that 70% of the customers are expected to come from within three miles of the site; that during peak traffic hours, 40% of the vehicles using the facility would be drawn from the existing traffic flow on adjacent streets; and that the stacking provided for at the site would be more than adequate to accommodate the projected number of vehicles using the facility during peak periods.

James Bates, a civil engineer, testified for plaintiff that if the use is approved, all village ordinances will be adhered to; that the sewage and water facilities are adequate to serve the subject property; and that the proposed facility from a civil engineering standpoint would have no adverse impact on the surrounding area and would be beneficial in all drainage, environmental, and civil engineering aspects.

Terrence O'Brien, a professional real estate appraiser, testified for plaintiff that if the property were put to the proposed use, there would be no adverse impact on the value of surrounding real estate based on the location of the site, primary uses of the surrounding properties, physical characteristics, design and landscaping of the project, and the need and demand for car wash facilities around the subject area; that there are more intense uses permitted in B-1-zoned areas which would have a greater impact upon the values or the area in general; that regardless of the type of development on the site, the fact that the subject site and adjacent areas are zoned B-1 will impact on land values in adjoining residential zones; and that plaintiff has

done a good job of minimizing the impact by placing the facility as far as possible from the south boundary and in providing buffers such as green areas. On cross-examination, O'Brien stated that the operations of all other uses permitted in B-1-zoned areas would be completely contained within each building except shipping and receiving; that he would question whether another use the same as already provided in the area would develop the site to its highest and best use; and that the "unique thing about the proposed use is there are none in the area, there is a need and a demand."

Rolf Campbell, a city planning and zoning consultant who in the past had rendered services for Niles, testified for plaintiff that the site involved is zoned B-1, which permits a car wash by means of a special use; that he found the proposed car wash can operate in accord with the requirements of the ordinance in question; that the impact of the facility would be no different than the other uses allowed within the B-1-zoned district under the ordinance; that it would be compatible with the existing commercial uses to the north, east, and west; and that it provides sufficient screening to the residential area to the south. On cross-examination, he stated that the ordinance does require stacking space for five cars in connection with car washing, but it was designed for drive-through tunnel-type facilities through which cars pass more quickly; that the proposed facility provided 36 spaces for stacking, which was adequate; that while permitted uses in the B-1 zone must be conducted within a fully enclosed building, only vacuuming and drying would be outside the facility; and that, although in a B-1 zone there must be a rear yard depth of at least 20 feet to act as a buffer to the contiguous residential property, it is not uncommon to have a yard for drying or parking at the rear or side areas.

Rudolph Valadez testified for defendant that he had observed a car wash of plaintiff in Schaumburg and seven or eight times has seen cars in the middle of the adjacent road waiting to enter the facility, and that he has seen cars backed up 10 or 15 deep coming from the entrance which tied up two out of three lanes of traffic.

Joseph Salerno, director of building and zoning for defendant, testified that the proposed car wash does not comply with the space restrictions in the Code for a B-1 use with respect to the use of the rear yard; that it did have adequate stacking space for vehicles entering the facility from the street; and that the wash bays are parking spaces and, because cars are parked in them at a 90-degree angle to a driveway, the building was not in compliance because the Code requires a distance of 27 feet for the automobile to safely exit the site.

He stated, however, on cross-examination, that if the bays are classified as "wash areas" rather than parking spaces, the building would be in compliance with the Code, and that a Niles police captain had stated at a village meeting concerning the facility in question that he saw no problem with cars backing up on the street to get into the facility.

Several nearby property owners testified that they objected to the proposed use for the reasons that the facility would create a traffic hazard, devalue property, and cause air pollution and noise, but they admitted that they had not hired an appraiser or traffic consultant to assess the potential impact of the facility.

Theodore Kowalski, a professional real estate appraiser, testified for defendant that the property can be developed in accordance with permitted uses in a B-1 zone, and that the development of the plaintiff car wash on the subject site would not be the highest and best use of the land and would cause a depreciatory effect on the apartment buildings to the south and on the commercial and residential uses to the west. He stated on cross-examination, however, that he had not studied any sales of residential property adjacent to other facilities of plaintiff to determine their effect on sales prices; that he had not spent any appreciable length of time observing the facility operations; that he was unaware of when the area was zoned B-1; and that, because the residences were located next to a B-1 zone, their value had already been affected.

Steven Hirsch, testifying in rebuttal, stated that plaintiff has a mechanical device for monitoring volume of use which disclosed that on June 20, 1981, the Schaumburg facility ran 1,816 4-minute cycles; that it ran 744 cycles on June 13—one of the days that Valadez said he had seen traffic congestion; and that on May 31, another day Valadez said he might have driven past the car wash, it ran 912 cycles. He also said that on June 20, 1981, he had taken hourly photographs and, while he was there, only on one occasion had he seen a second car in line at three of the bays; that on that day, he saw no cars backed up on the adjacent road; that approximately 25 to 35% of persons using the facility dry their cars; that "No Radio Playing" signs will be posted at the proposed car wash; and that he knew of no operation of plaintiff that had ever been abandoned.

OPINION

The seminal issue presented for review is whether the trial court's finding that defendant's denial of the requested special use was arbitrary and unreasonable and bore no substantial relation to the public

health, safety, or welfare was against the manifest weight of the evidence.

The fact that a special use was denied does not impair plaintiff's right to test the effect of the denial by the traditional standards of reasonableness which govern review of zoning ordinances. (*Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 241 N.E.2d 454; *La Salle National Bank v. County of Lake* (1975), 27 Ill. App. 3d 10, 325 N.E.2d 105.) However, zoning is a legislative function (*LaGrange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 388 N.E.2d 388); and there is a presumption of validity in favor of the action taken by the legislative body (*Copley Memorial Hospital, Inc. v. City of Aurora* (1981), 99 Ill. App. 3d 217, 425 N.E.2d 493) which is not overcome unless a property owner shows by clear and convincing evidence that the ordinance as applied to him is unreasonable and bears no substantial relation to the public health, morals, safety, or welfare (*County of Cook v. Priester* (1976), 62 Ill. 2d 357, 342 N.E.2d 41).

■ While no one factor controls in determining the validity of the legislative decision (*La Grange State Bank v. County of Cook*), the traditional tests to review zoning decisions in the special use context are summarized as follows:

> "The general factors considered *** include the uses and zoning of nearby properties, the extent to which existing zoning diminishes the property's value and the proposed zoning enhances it, the suitability of the property for the purposes permitted under the existing zoning, and the relative gain to the public as compared to the hardship imposed upon the property owner by the existing and the proposed zoning uses." (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 111-12, 324 N.E.2d 406, 409; see also *La Grange State Bank v. County of Cook*.)

In addition, the court may take into account any and all standards for special uses established by the legislative body (see *La Salle National Bank v. County of Lake*) and, thus, the trial court here could properly have considered that, under the ordinance a special use can be granted when the proposed use "(a) [i]s deemed necessary for the public convenience at that location; (b) [i]s so designed, located, and proposed to be operated that the public health, safety, and welfare will be protected; and (c) [w]ill not cause substantial injury to the value of other property in the neighborhood in which it is located." (Village of Niles, Ill., Code of Ordinances, appendix B, at 1298.63 (Nov. 9, 1965).) However, compliance with all the criteria may be an

indication but does not necessarily mean that the denial of special use is arbitrary and unreasonable. As explained in *La Salle National Bank v. County of Lake*:

> "The nature of a special use does not make the issuance of a permit mandatory upon compliance with the county standards. [Citation.] The granting of a special-use permit is not merely a ministerial function of a legislative body. Rather, whenever a special use is proposed a legislative body must make an independent determination that the particular use in the proposed location is designed in such a way as to be compatible with the surrounding area. Whether a special use is compatible depends upon the circumstances of each case. In certain situations it is entirely possible for a special use to have no adverse effect despite its failure to comply with all standards. [Citation.] In others, the special use may have adverse effects even though it complies with all of these standards. Therefore, any standards which a legislative body has passed beforehand can only serve as guidelines. To hold that prior standards are absolute requirements which must rigidly be adhered to would rob the special-use technique of its much needed flexibility. We must note again, however, that while strict adherence to the legislative body's own standards is not required of that body in passing on special uses, a legislative body must exercise its power in a reasonable way and adherence to these standards is a strong indication of reasonableness." (27 Ill. App. 3d 10, 16-17, 325 N.E.2d 105, 111.)

Furthermore, in cases of this nature where there is often a conflict of testimony, the trial court is in a superior position to assess the credibility of witnesses and to determine the weight to be accorded the evidence, and the findings of the court will not be disturbed on review unless against the manifest weight of the evidence. *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65; *Cornell v. County of Du Page* (1977), 58 Ill. App. 3d 230, 374 N.E.2d 1.

Turning then to the factors as stated above in *Duggan v. County of Cook*, we first look to the existing uses and zoning of nearby property. This factor has been held to be of paramount importance in zoning determinations (*Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719) and, in the instant case, defendant acknowledges that the subject site should be developed with a commercial use, and thus an extensive discussion of nearby and adjacent properties is unnecessary.

Secondly, concerning the extent to which the value of the subject

property would be diminished or enhanced by the proposed use, O'Brien testified that he "would have to question whether another use that would be the same as already provided in the area, whether it would develop the subject site to its highest and best use." While Kowalski testified that in his opinion the development of the car wash would not be the highest and best use of the property because of its depreciatory effect on the surrounding uses, he admitted that he had not studied the effect of other facilities of plaintiff on sales prices; that he did not know whether the site was zoned B-1 prior to the time the adjacent residences were constructed; and that, because the residences were located next to a B-1 zone there had already been some impact on their value.

Next, defendant posits that the facility is unsuitable for the proposed use in failing to comply with rear yard, parking, and stacking requirements of the Code. In this regard, Campbell testified that the proposed facility could be operated in accordance with the site plan to protect the public health, welfare, and safety; that it could be operated in accordance with the ordinance and with the site plan as developed; that the facility met the special use standards of Niles; that the five-car stacking requirement was designed and intended for a drive-through tunnel-type car wash, and the 36 stacking spaces provided for in the proposed facility were adequate; that although the ordinance requires a rear depth of not less than 20 feet to provide air and open space to the contiguous property owner, "it is not uncommon to have a yard for drying and parking within a rear or side yard area"; and further, that under the special use provisions, defendant has the right to allow drying or parking within the rear yard area. There was also testimony to the effect that only 25 to 35% of patrons dry their automobiles; that an attendant would always be present; and that "No Radio Playing" signs would be posted in the drying area to curtail noise.

The sole testimony of defendant in this regard came from Salerno, its director of building and zoning, who stated in substance that the washing bays in the facility should be considered as 90-degree parking spaces which, under the Code, required 27 feet of exit space, and because this was not provided the plan was not in compliance with the Code. We note, however, that Salerno did not cite any section of the ordinance to support his view that the washing bays should be considered as parking spaces, and he stated his agreement with Campbell that parking consisted of persons leaving their cars and distancing themselves from the cars. It appears clear that those using the washing bays would not come within that definition, and defendant has referred us to nothing other than the testimony of Salerno

that the wash bays should be considered as parking spaces. Since we have found no support thereof in the record, we reject his conclusion in this regard. Significantly, Salerno testified that if the wash bays were not considered as parking spaces, the building would be in compliance with the requirements of the Code.

Salerno also testified that there was a 20-foot rear yard requirement in a B-1 zone and that the rear yard could be used for parking "but not for part of the use." He was not asked to explain what he meant by "part of the use," but it appears that it could only be the drying of the vehicles. We note, however, that defendant did not, through Salerno or any other witness, negate the testimony of Campbell (a) that the facility met the special use standards of Niles; (b) that it was not uncommon to use the rear yard for drying vehicles; and (c) that the five-car stacking requirement applied to a drive-through car wash, and the 36 stacking spaces provided for in the instant facility were adequate.

Finally, although the only evidence as to a hardship on plaintiff relative to the public benefit if the use were denied was the possibility of investment loss, there was ample evidence presented that the proposed use, as designed and located, would be operated as to protect the public health, safety, and welfare.

In this regard, the testimony indicated that the proposed facility would minimally impact upon Dempster and the adjacent street systems insofar as generating traffic volumes and causing traffic congestion due to entering and exiting traffic. Kenig observed that peak hours for the car wash occur on weekends, when street traffic is reduced, and that three stacking positions behind each wash bay would be adequate during peak activity periods. A Niles police captain stated that he saw no problem with cars backing up on the street to enter the facility. While Valadez testified that he had observed traffic congestion at a car wash of plaintiff in Schaumburg, Hirsch stated, in rebuttal, that on a day when twice as many 4-minute cycles were run than on the day Valadez was there, on only one occasion did he observe a second car in line at three of the bays at the Schaumburg facility. Evidence pertaining to sewage and water facilities was to the effect that existent facilities will adequately serve the proposed facilities and will not adversely affect the surrounding area from an environmental standpoint. Further, it was the opinion of O'Brien and Campbell that the 5-foot-wide green areas south of the operation will minimize any impact and provide sufficient screening, and Hirsch also stated that an attendant will be on duty at all times; that "No Radio Playing" signs will be posted on the premises; and that, as far as he

knew, none of the other operations of plaintiff had ever been abandoned.

Further, plaintiff's appraiser testified that in his opinion the value of surrounding properties would not be adversely affected and that an area zoned B-1, in itself, impacts on the values of adjoining residential areas. While defendant's appraiser testified that the operation of a car wash would have a depreciatory effect on the surrounding land values, he admitted on cross-examination that in forming his opinion he had not studied the effect of other facilities of plaintiff on sales of adjacent residential property; that he had not spent a great deal of time observing the operations of such facilities; that he did not know when the property was zoned B-1; and that there has already been an impact on the value of the residential properties due to their location adjacent to the B-1 zones. Further, while nearby property owners opposed the car wash in the belief that it would devalue their property, it was developed on cross-examination that their statements were conjectural.

Also relevant to determining the gain or detriment to the public in permitting the proposed use is the aspect of public necessity. (*La Salle National Bank v. County of Lake.*) Although the lack thereof does not, in itself, require denial of the permit, a finding of public necessity may outweigh certain adverse aspects on the community. (*La Salle National Bank v. County of Lake.*) Here, there was evidence presented by Hirsch and corroborated by Kenig that according to demographic and market research studies, 75% of the potential customers of plaintiff live within three miles of the facility; that there was no self-service car wash within 10 miles of the subject site; and that 90% of its customers will not use an automatic tunnel car wash as an alternative to a self-wash facility. In addition, O'Brien testified that there was a need and demand for the facility, since there was no other car wash in the area. No contrary evidence was presented by defendant.

In the light of the above and from our consideration of the totality of the evidence, we are left with the belief that the record supports a finding that plaintiff overcame the presumption of validity of the legislative determination by establishing through clear and convincing evidence that defendant's denial of the special use permit to it bore no substantial relationship to the public health, safety, or welfare and, in view thereof, we find no abuse of discretion in the grant of the special use in question. As stated in *Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 116, 324 N.E.2d 406, 411:

"If a court determines that the denial of a special use permit, including the conditions and restrictions suggested by the zoning procedures and record as a part of such permit, does not bear a real and substantial relation to the public health, safety, morals or general welfare, judicial relief must be granted."

In the light of the foregoing, we cannot say that the judgment appealed from was against the manifest weight of the evidence and, accordingly, it is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.