ROCKFORD BLACKTOP CONSTRUCTION COMPANY *et al.*, Plaintiffs-Appellees, v. THE COUNTY OF BOONE, Defendant-Appellant.

Second District   No. 2—93—0182

Opinion filed June 10, 1994.

Roger T. Russell, State's Attorney, of Belvidere (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellant.

John H. Maville, of Law Offices of John H. Maville, of Belvidere, for appellees.

JUSTICE QUETSCH delivered the opinion of the court:

Defendant, the County of Boone (County), appeals the judgment of the circuit court which enjoined it from enforcing against plaintiffs' property the five-year limitation on special-use permits issued pursuant to section 20 of the zoning ordinance of Boone County (zoning ordinance) (Boone County, Ill., Zoning Ordinance § 20 (1984)). The sole issue for review is whether the trial court erred in finding section 20 invalid on the basis that the five-year limitation is arbitrary, capricious, and an unreasonable exercise of the County's police powers.

Plaintiffs, Rockford Blacktop Construction Company (Rockford Blacktop), Marjorie Churchill, and Lucille Sisson, filed a complaint for injunctive relief against the County, alleging that Rockford Blacktop was the contract purchaser of properties owned by Churchill and Sisson (Churchill and Sisson property). This property, at Irene and Graham Roads, is in an area zoned A-1 for agricultural use. Rockford Blacktop intended to use the property as a dolomitic limestone quarry.

At trial, Daniel Fischer, a geologist and vice-president of the aggregate producing division of Rockford Blacktop, testified that adjacent to the south side of the Churchill and Sisson property was an existing quarry operated by Rockford Blacktop, the Irene Quarry. Rockford Blacktop had been operating the Irene Quarry since the early 1960s. It intended to expand the Irene Quarry onto the Churchill and Sisson property. Fischer further testified that the cost to set up the equipment necessary to conduct a quarrying operation is between $30,000 and $50,000. In addition, there must be site preparation, which includes stripping and removing the overburden (soil overlying the limestone), fencing, building landscape berms, and seeding. During the first three years of operation, the quarry must build berms and plant trees on them. The zoning ordinance requires

reclamation when a quarry is closed, which entails regrading the slopes, installing topsoil, and reseeding. Fischer admitted that the cost of reclamation included reclaiming the existing quarry and that Rockford Blacktop could have applied for a special-use permit which would not require the reclamation of the existing quarry.

Fischer explained that limestone is quarried by blasting the rock. Blasting can be controlled so that it causes no damage to nearby structures and causes minimal vibration. Rockford Blacktop seismographs every blast to ensure that it is below established limits for noise and vibration.

Fischer further stated that the estimated total cost to expand the Irene Quarry would be $200,000; however, if Rockford Blacktop were bound by the five-year permit, the total cost would be $528,000. Fischer explained the $328,000 difference as follows:

"[I]f we only have 5 years to mine the property, we would only affect approximately 3 to 5 acres. 3 to 5 acres would not give us enough soil to do the reclamation on the—the lower part. The quarry processing area is almost 40 acres[.] *** [I]f we only mined 3 to 5 acres there is not enough soil to take from 3 to 5 acres and put onto 40 acres to—to do the reclamation; so we would have to haul in topsoil."

According to Fischer, the major use for limestone is in road construction as aggregates, and it also is used as "riprap" for erosion control, as a soil neutralizer for agriculture, and as fluxstone to purify steel. Fischer was unaware of any substitute for limestone for these purposes. Fischer opined that the demand for limestone will increase. Although there are between 15 and 20 other limestone quarries in the area, the Irene Quarry's limestone is high quality, and Fischer knew of only two other quarries with that quality of limestone. The depth of the existing quarry is 87 feet, and there are deposits that range to 300 feet; however, the quality varies more and is poorer deeper down. The projected life of the existing quarry is eight years.

On questioning by the court, Fischer stated that he could not estimate the "break-even" point for the operation and reclamation of a 15-acre quarry. Although the Department of Mines and Minerals is empowered to enforce vibration and noise limits, Fischer also did not know if it could shut down the operation. Fischer admitted on cross-examination that, even though Rockford Blacktop had not received any complaints in the past year, at the hearings on the special-use permit, there were complaints by nearby residents about the blasting. Fischer also admitted that the additional property would make the Irene Quarry the largest limestone quarry outside of Kane and Cook Counties and that there is a residential subdivision bordering the quarry.

Arthur Pincomb, a geologist and mine appraiser, testified that the average life of a quarry is 25 years. Pincomb estimated that the Irene Quarry and the Churchill and Sisson property would be worth $1,862,000. However, if the quarry would be limited to a five-year operation, it would be worth only $744,000. Pincomb stated that the stone in the Churchill and Sisson property "is one of the highest quality ledges available in the state" and that the section that is exposed in the Irene Quarry is high quality from top to bottom. This ledge extends from Iowa, through Illinois and Indiana. According to Pincomb, in nearly all areas it is "unmineable" because the ledge lies under hundreds of feet of overburden; by contrast, the Irene Quarry deposit sits in an erosional remnant caused by the glaciers.

Rolf Campbell, a city planning and zoning consultant and landscape architect, testified that he had never encountered a zoning ordinance that placed a time limit on earth materials extraction. The zoning ordinance did not have a time limit for any special uses other than mineral extraction. Campbell believed that several of the special uses listed in the ordinance were similar to mineral extraction, specifically airports and heliports, artificial lakes, commercial breeding and raising of nonfarm fowl and animals, boarding and breeding kennels, manufacture, storage and use of explosives, penal institutions, sanitary landfills, sewage disposal plants, shooting ranges, slaughterhouses, riding stables, and stadiums and athletic fields. Campbell opined that there was no logical reason to limit the term of earth materials extraction while not limiting the term for these other special uses.

In addition, he stated that a lengthier extraction period was necessary because quarrying is a major, long-term operation. A five-year limitation "precludes the ability to amortize [the] investment" in the quarry. He further opined that the five-year limitation would not promote predictability or stability and it was arbitrary and capricious. He also believed that the limitation would be harmful to the community. On cross-examination, Campbell admitted that he had seen special-use permits with time limits on quarries. Campbell explained that his concern about the limitation was twofold: first, he believed that the quarry operator "would not do a good job *** with reference to the reclamation" and "protections during the operation"; and, secondly, the limitation does not benefit the economic well-being of the county. Campbell believed that the major corporations would not develop a site with a five-year limitation. As Campbell interpreted the ordinance, at the end of five years, the quarry operator would have to reapply for a special-use permit in a *de novo* proceeding. Campbell would impose a time limit related to the life of the quarry.

On questioning by the court, Campbell stated that the special-use permit outlines the standards for the particular use so that it incorporates controls to ensure reclamation. When asked whether the time limit's purpose could be to allow the County to account for a changing environment or additional residential growth in the area, he explained that those concerns should not be a problem because of Boone County's comprehensive plan, which seeks to preserve prime agricultural land and mineral resources.

The court found that the five-year limitation would preclude operators from opening a quarry or gravel pit because it would not be economically feasible. The court further found that the five-year limitation would encourage litigation and was contrary to the policy of the comprehensive plan, which recognizes the importance of mineral resources to the County's development. For these reasons, the court found that the five-year period is an arbitrary, capricious, and unreasonable exercise of the police powers and bears no substantial relationship to the health, safety, morals, and welfare of the public. The court therefore ruled that the five-year limit is void and unenforceable, and it enjoined the County from enforcing it against plaintiffs' property. The County timely appealed.

The County contends that the court erred in invalidating section 20 of the ordinance because the five-year limitation on special-use permits is a reasonable exercise of the County's police power. The ordinance limits the term of the special-use permit to five years, and the renewal term of the permit may be for up to five years. (Boone County, Ill., Zoning Ordinance §§ 20.5, 20.6(1) (1984).) Section 20.6 further provides:

> "A request to renew the Special Use permit when no additional acreage or equipment will be brought into use shall be handled in the following manner:
>
> a. If an operator is not able to finish mining the acreage described in the Special Use Permit in the time specified, he shall apply to the Zoning Board of Appeals. A public hearing will be held. The maps required by this Ordinance for the initial hearing shall be revised, updated and resubmitted along with a statement of the current status of the mining reclamation. A new map describing conditions present on the site shall be furnished." Boone County, Ill., Zoning Ordinance § 20.6(3) (1984).

We may not disturb the trial court's ruling unless it is against the manifest weight of the evidence. (*Harris Bank v. County of Kendall* (1993), 253 Ill. App. 3d 708, 715, citing *Illinois National Bank & Trust Co. v. County of Winnebago* (1960), 19 Ill. 2d 487, 495.) Zoning restrictions are presumed valid, and the party challenging the re-

striction has the burden of proving by clear and convincing evidence that the ordinance is unreasonable and arbitrary and bears no substantial relation to public health, safety, morals, or welfare. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310.) "[T]he presumption of validity of an ordinance is overcome when it is shown that there is no reasonable basis requiring the restriction imposed and the gain to the public is small as compared to the hardship imposed on the property owner." (*County of Cook v. Priester* (1976), 62 Ill. 2d 357, 368.) The County's careful, comprehensive planning of its development bolsters the validity of the zoning restriction. (*Racich v. County of Boone* (1993), 254 Ill. App. 3d 311, 316.) Where the reasonableness of the restriction is "fairly debatable," the court may not interfere with the legislative judgment. *Harvard State Bank v. County of McHenry* (1993), 251 Ill. App. 3d 84, 95.

■ A special-use permit is a zoning technique which allows an infrequent, beneficial use of a piece of property that is inconsistent with the normal uses of a zoning district. It has the following purpose:

"Instead of excluding such uses entirely from certain zones because of the harm they might cause, or, despite the potential harm, including them because of the benefits they will bring, the special use technique allows a more flexible approach. It contemplates that the county board may permit these uses when desirable and, if necessary, impose conditions designed to protect nearby property owners." *Kotrich v. County of Du Page* (1960), 19 Ill. 2d 181, 185.

Plaintiffs assert that the five-year limitation is facially unreasonable, arbitrary, and capricious. However, plaintiffs' expert acknowledged that other municipalities have placed time limits on special-use permits for quarries. We also note that a special-use permit may be "issued for certain periods of time and under certain restrictions which allow the *** county authorities the opportunity to maintain a certain degree of control of the special use." (*Consumers Illinois Water Co. v. County of Will* (1991), 220 Ill. App. 3d 93, 96.) (We note, parenthetically, that a model zoning ordinance provides that a special-use permit for stone quarrying may be issued for a period of from one to five years. (5 R. Anderson, American Law of Zoning § 33.45, at 356 (3d ed. 1986).)) The reasons supporting the time limitation as applied to the quarry here will be discussed *infra*. We conclude that the five-year limitation is not facially invalid.

To determine whether the zoning restriction as applied to a specific property relates to the public health, safety, and welfare, courts consider the following factors: (1) the existing use and zoning of nearby property; (2) the extent to which property values are

diminished by the restriction; (3) the extent to which the diminution of the plaintiff's property value promotes the health, safety, and welfare of the public; (4) the relative gain to the public versus the hardship imposed on the plaintiff; (5) the suitability of the property as restricted; (6) the length of the time the property has remained vacant as zoned (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47); (7) the community need for the proposed use; and (8) the care with which the community has undertaken its development plan (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378). Although no one factor is controlling, the first factor is of paramount importance. (*Hamann v. Sumichrast* (1991), 222 Ill. App. 3d 962, 976.) The validity of the ordinance in question will be determined in light of the circumstances of the individual situation. *Lambrecht v. County of Will* (1991), 217 Ill. App. 3d 591, 594.

■ The existing zoning of the surrounding area is agricultural, but the testimony indicates that there is a residential subdivision nearby. The five-year restriction would allow the County to evaluate the use of the property as a quarry in light of any changes during the five-year period, including whether the residential use has expanded. This factor suggests that the five-year restriction is reasonable.

Plaintiffs presented evidence to show that it is not economically feasible to operate a quarry for only five years. The trial court's decision, which accepted plaintiffs' position, is premised on the assumption that when the five-year period expires, the quarrying operation must shut down. However, section 20.6 of the ordinance contemplates that the mining operation might not be completed at the end of five years, and it indicates that at the expiration of the permit, the quarry may apply again for another five-year permit. The renewal permit may not be denied arbitrarily; the denial must be related to the public health, safety, morals, or general welfare. If the zoning board wrongly denies the permit, the quarry operator may seek judicial review. (*Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 84.) Although plaintiffs argue about the likelihood of renewal of the permit, they presented no evidence of this at trial, and their factual assertions in their brief lack citation to the record. (See 145 Ill. 2d R. 341(e)(7).) As noted above, it was plaintiffs' burden to prove by clear and convincing evidence that the regulation was unreasonable. Thus, plaintiffs failed to prove that they will have to cease operations at the end of five years because the permit will not be renewed. This factor does not favor plaintiffs.

Factors three and four are to be evaluated together to determine whether the relative gain to the public outweighs the hardship imposed on the property owner. (*Hamann*, 222 Ill. App. 3d at 980.)

The five-year restriction gives the County the flexibility to determine how the operation of the quarry affects the public health, safety, and welfare. In determining the validity of a five-year limitation on a special-use permit for a bituminous concrete plant, the superior court of New Jersey noted:

> "[O]f controlling importance, we regard the power to impose the limitation as reasonably incident to the [zoning] board's responsibility to see to it, among other things, that the use not be attended by any substantial detriment to the public good. Ordinary tests as to compliance with particular performance standards might not be a totally satisfactory method of determining whether this industrial operation would over the long run be harmful to the welfare of the municipality. An evaluation of the over-all results of a five-year experience with the plant by the community could possibly be more useful and would provide an escape-hatch if the board concluded that continuance of the plant thereafter was not consistent with the public good. The condition is valid." (*Houdaille Construction Materials, Inc. v. Board of Adjustment* (1966), 92 N.J. Super. 293, 303-04, 223 A.2d 210, 216.)

Similarly, the limitation here allows the County to impose new conditions on the permit if the experience of the first permit indicates that additional conditions would promote the public health, safety, or welfare. We conclude that the hardship imposed on the quarry operator in seeking a new permit after five years is far outweighed by the benefit to the public in controlling the quarrying operation.

The fifth and sixth factors, the suitability of the property as zoned and whether the property has been vacant as zoned, are of little significance under the present facts. The seventh factor, the community need for the proposed use, favors plaintiffs. They presented evidence that the County, and the State, need high-quality limestone. However, plaintiffs have not shown that the five-year limit on the permit will deprive the community of the product, because plaintiffs have not proved by clear and convincing evidence that it is likely that the quarry would have to shut down after five years.

Finally, the County has carefully and comprehensively planned its development. The property is in an area designated to remain agricultural, and the development plan places a high priority on maintaining its farmland. Thus, it is unlikely that there will be more residential development in the area which could decrease the quarry's chances of having a renewal permit approved. This factor also favors the validity of the restriction.

We emphasize that the County did not deny a special-use permit for quarrying. As noted above, the five-year limitation does not deny the quarry operation the opportunity to continue. The main thrust of

plaintiffs' arguments on appeal, and the trial court's findings below, is grounded on this erroneous assumption. The core question is whether the five-year restriction is unreasonable. The County Zoning Board made a legislative determination that special uses for quarrying should be reviewed every five years to allow for changing circumstances which would affect the public health, safety, or welfare. The evidence here, at most, merely shows that the reasonableness of the restriction is "fairly debatable." Thus, the manifest weight of the evidence does not support the trial court's interference with the legislative judgment.

The court enjoined the County from enforcing the ordinance against plaintiffs' property. An injunction is an extraordinary remedy which should be granted only when the plaintiff establishes the existence of a lawful right, irreparable harm, and an inadequate remedy at law. Injunctions are not favored, and a court should issue an injunction only when the urgency of the situation requires it. (*Tim Thompson, Inc. v. Village of Hinsdale* (1993), 247 Ill. App. 3d 863, 874.) Because the ordinance is not invalid, there is no basis on which the court could issue the injunction.

We therefore reverse the judgment of the circuit court.

Reversed.

INGLIS, P.J., and BOWMAN, J., concur.